ORIGINAL

_X_ ~~Promptscan~~
___ Send
___ Clsd
___ Enter
___ JS-5/JS-6
___ JS-2/JS-3

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERFECT 10, INC.,<br><br>          Plaintiff,<br><br>     v.<br><br>CCBill, LLC, et al.,<br><br>          Defendants. | NO. CV 02-7624 LGB (SHx)<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISQUALIFY** |

## I.    INTRODUCTION

Defendant Internet Billing Company, LLC ("IBill") has filed the instant motion to disqualify Plaintiff Perfect 10, Inc.'s ("Perfect 10") counsel. IBill alleges that Perfect 10 has obtained attorney-client privileged information from IBill's former general counsel, Edward Cherry, and that the disclosure of that information violates Perfect 10's attorney-client privilege. Perfect 10 seeks disqualification of Perfect 10's counsel from any future participation in the action against IBill.

DOCKETED ON CM

APR 15 2004

BY _____ 010

(237)

Defendants CCBill, LLC ("CCBill") and Cavecreek Wholesale Internet Exchange, LLC ("CWIE") have also filed a Joinder in IBill's motion to disqualify. CCBill and CWIE seek disqualification of Perfect 10's counsel from any future participation in the action against them because counsel for CCBill and CWIE previously served as co-counsel with IBill pursuant to a Joint Defense Agreement between the parties.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Perfect 10 filed its Complaint against Defendants CCBill, Internet Billing Company, Paycom Billing Services, Inc., IMA Enterprises, Inc., Clarence Coogan, U. Berger, Cybertech Communications, NV, Celebskank, Network Authentication Systems Corporation, CWIE, Netpass Systems, Inc., and Internet Key on September 30, 2002. The Complaint alleges the following claims: Claim 1: copyright infringement; Claim 2: trademark infringement; Claim 3: trademark disparagement; Claim 4: wrongful use of registered mark; Claim 5: wrongful use of registered mark; Claim 6: unfair competition; Claim 7: false and misleading advertising; Claim 8: RICO (investment of proceeds); and Claim 9: RICO (participation in criminal enterprise). On October 16, 2003, the Court ordered the bifurcation of discovery in this case. See October 16, 2003 Minute Order. The first phase of discovery was to relate solely to the Defendants' defenses to the claims under the Communications Decency Act ("CDA") and the Digital Millenium Copyright Act ("DMCA"). Id. Phase I discovery was closed on January 16, 2003. See November 17, 2003 Minute Order, at 2. On February 6, 2004, IBill filed its motion for summary judgment against Perfect 10 based on its defenses to Perfect 10's claims under the CDA and DMCA.

A.     Edward Cherry's Employment at IBill

Edward Cherry was employed at IBill from March 2000 to February 16, 2003. Persily Decl., ¶ 3.  At the time of his departure, his title was General Counsel and Vice-President of Legal Affairs.  Id.  During Cherry's employment at IBill, he was responsible for handling the legal affairs of IBill.  Id., ¶ 4.  Cherry was also IBill's registered copyright agent for copyright complaints.  Id.  Cherry was responsible for handling the legal aspects of the current litigation on behalf of IBill from September 30, 2002 through February 16, 2003 when Cherry resigned from IBill.  Id., ¶¶ 5,6. Cherry's responsibilities included the formulation of IBill's legal strategies, communicating IBill's legal strategies to management and receiving management's input on those strategies, and working with outside litigation counsel to develop and implement IBill's strategies and defenses.  Id., ¶ 5.  IBill never authorized Cherry to disclose attorney-client privileged information or attorney work product to Perfect 10 or anyone working on behalf of Perfect 10.  Id., ¶ 10.  Cherry also was not entitled to disclose to Perfect 10 any IBill memorandum or other confidential business information, including IBill's implementation of Visa regulations.  Id., ¶ 11.

Cherry resigned from IBill on February 16, 2003.  Persily Decl., ¶ 6.  On February 26, 2003, IBill sued Cherry for misappropriation of over $600,000 of IBill's corporate funds.  Id., ¶ 7; Exh. A.

B.     Perfect 10's Counsel and President Norman Zadeh

Perfect 10 is represented in this litigation by Ronald Johnston and Sean Morris of Arnold & Porter.  Perfect 10 is also represented by Jeffrey Mausner and Laurence Berman of Berman, Mausner & Resser.  Perfect 10's in-house counsel are Daniel

Cooper and Randall Lewis.  Norman Zadeh is the president of Perfect 10 and has been an active participant in the current litigation.

C.     Edward Cherry's Communications with Zadeh

Perfect 10 has produced several emails between Zadeh and Cherry to IBill.  See Baum Decl.  Perfect 10 did not disclose its email exchanges with Cherry until after the close of Phase I discovery.  Baum Decl., ¶ 9.  The relevant content of the emails follows below.[1]

On September 12, 2003, Zadeh sent the following email to Cherry:

*Edward,*

*My people thought the best way to handle it is for you to defend yourself, so there would be no issue of tarnishment.  If you think the question is privileged, you just don't answer it.  We would be making our own objections to certain questions, etc.*

*Regards,*

*Norm*

Zadeh Decl., Exh. A.

-----

[1] In most cases, the Court has preserved the spelling and grammar of the emails as written; however, in any case where the Court has changed the text of the email, the changes are noted in footnotes.

4

On September 17, 2003, Cherry sent Zadeh an email which acknowledged that Perfect 10 would be paying for his trip to California and offered to pay for half of the ticket since he had flown first class.  Baum Decl., Exh. H.

On September 21, 2003, Zadeh sent Cherry the following email:

*Hi Edward:*

*Jeff just told me that Spillane sent you a declaration that he wanted you to sign.  Can you fax a copy of that to me at 310-205-9644?*
*Thank you again so much for your help.*

*This country would be in alot better shape if there were more lawyers that had the kind of integrity that you have.*

*Best regards and thanks,*

*Norm*

On November 10, 2003, Zadeh sent the following email to Cherry:

*Hi Edward,*

*As you can probably guess, we need to take your deposition in the Ibill case, anywhere from Nov 21 onward but the sooner the better as the summary judgment motions could hit as early as Dec 8.  We would prefer to have you come to CA if you are willing and will pay all*

*expenses.*

*Do you have a preference?*

*Thanks so much as always for your help.*

*Best regard,*

*Norm*

*P.S. Bennett's depo today was nothing short of amazing.*

Baum Decl., Exh. I.

On November 10, 2003, Cherry sent an email to Zadeh which states, "both ccbill and ibill knew of the infringement and allowed to occur, [p]rofiting as well." Zadeh Decl., Exh. B.[2]

On November 16, 2003, Cherry sent an email to Zadeh responding to Zadeh's inquiry as to when the "Visa rule came out which effectively required Ccbill to look at the sites it billed for." Cherry responded as follows: "give me a couple of days to search my computer. I am sure I drafted a compliance memorandum or email." Baum Decl., Exh. N.

The following email exchange also occurred sometime around December 30, 2003:

---

[2] The email actually says "orofting" but the Court finds that this is most likely a spelling mistake and that the intended word was "profiting."

6

*Edward,*

*I thought you'd get a kick out what's been happening with Ibill. After promising basically to answer all interrogatories and document requests, Ibill pretty much didn't answer any of them, but still claims that we are supposed to take the 30(b)6 depo with no discovery. We cancelled the deposition and now they are going nuts. But we are still planning on taking Bender's depo in the near future.*

*Anything good happening to you?*

*Best regards,*

*Norm*

      *[Norm:]*

      *Just hanging in. These guys have pretty much slandered me to the whole industry. I know that they are doing this to try to starve me, but my allegiance is to the truth and that shall prevail. These guys have made millions of dollars off of bad content.*

      *I cannot wait till these bastards send you a huge settlement check. If we do not speak, have a healthy and prosperous new year. See you soon Norm.*

*Edward*

*[Edward:]*

*Please keep me updated.  We decided not to take your deposition for a while.  Corporations can be exceedingly cold and heartless.*

*We're routing for you.*

*Best regards,*

*Norm*

Baum Decl., Exh. P.

On January 13, 2004, Cherry responded to an email from Zadeh which asked, "Any questions you'd like me to ask Mr. Bender or the 30b6 witness who I think would have been involved in compliance issues?"[3]  Cherry responded as follows:

*Absolutely:*

*Was there a difference in policy concerning the clients with large revenue who were accused of copyright infringement.*

---

[3] Garrett Bender is the former Chief Executive Officer of IBill.  Mausner Decl., Exh. 3 at 1.

> *Specifically, did you tell Mr. Cherry, the copyright agent that large clients were not to have service interrupted, but instead were simply told to remove the images at their convenience.*

> *I will testify that NMS, ARS, and Babenet were given preferential treatment at the command of Garrett Bender.*

Baum Decl., Exh. D.

On February 8, 2004, Cherry responded to an email from Zadeh stating that he would read through IBill's opposition for summary judgment and offered to provide "an affidavit explaining that [IBill] received notices (I received them) from perfect 10, and we sum[m]arily refused to inter[r]upt service because the clients were large in size." Baum Decl., Exh. C.

D.    Edward Cherry's Communications with Perfect 10's Counsel

1.    *Daniel Cooper: General Counsel of Perfect 10*

Daniel Cooper has submitted a declaration which states that the he had no personal knowledge of the email communications between Zadeh and Cherry until IBill informed Perfect 10 of its intention to file a motion to disqualify. Cooper Decl., ¶ 3. The declaration also states that the only personal contact Cooper has had with Cherry was a five-minute conversation in August 2003 regarding facts related to the Perfect 10 v. Net Management Services action and Cherry never disclosed to him any advice or communication between him and IBill. Id., ¶ 4.

2.    *Randall Lewis: Associate Counsel of Perfect 10*

Randall Lewis has submitted a declaration which states that he had no personal knowledge of the email communications between Zadeh and Cherry until IBill informed Perfect 10 of its intention to file a motion to disqualify. Lewis Decl., ¶ 3. The declaration also states that Lewis has never had a substantial communication with Cherry. Id., ¶ 4.

3.    *Ronald Johnston: Associate Counsel of Perfect 10*

Ronald Johnston has submitted a declaration which describes his interactions with Cherry regarding the Memorandum (discussed below). See Johnston Decl., ¶¶ 1-7. The declaration also states that the only other interaction between Cherry and Arnold & Porter was in connection with obtaining a declaration in the case Perfect 10 v. Net Management Services, Inc. Id., ¶ 8. The declaration states that neither Johnston nor anyone else at Arnold & Porter has ever made any payment or provided other consideration to Cherry or solicited or received legal advice from him. Id., ¶ 9.

4.    *Sean Morris: Associate Counsel of Perfect 10*

Sean Morris has submitted a declaration which states that Morris has never had a substantial conversation with Cherry and that his interactions with Cherry were limited to telephone conversations regarding the Memorandum (discussed below) which Cherry mailed to Arnold & Porter. Morris Decl., ¶¶ 3-6. Morris' declaration also states that he has never made any payments to Cherry, solicited legal advice from

him, hired him as an attorney, or consulted him as an attorney.  Id., ¶ 7.  The declaration also states that he never requested any privileged or confidential information from Edward Cherry, and never received any such information.  Id.

### 5.   *Jeffrey Mausner: Associate Counsel of Perfect 10*

Jeffrey Mausner has submitted a declaration which states he has never requested any privileged or confidential information from Cherry and has never received any such information.  Mausner Decl., ¶ 3.  The declaration also states that Mausner advised Cherry that he did not want Cherry to disclose any privileged information to him.  Id.  Mausner declares that Cherry never told him any advice that he gave to IBill or disclosed any of IBill's litigation strategies.  Id.  The declaration also states that Mausner never hired Cherry as an attorney or consulted him as an attorney.  Id., ¶ 8.

### E.   The Memorandum Mailed by Edward Cherry to Perfect 10

Ronald Johnston submitted a declaration which states that the first contact between Arnold & Porter and Cherry was a voice-mail message by Cherry for Sean Morris on February 18, 2003.  Johnston Decl., ¶ 2.  Johnston states that he called Cherry on February 19, 2003 and advised him that he could not speak to him regarding any communications between IBill and him.  Id.  Cherry told Johnston that he possessed a memorandum (hereinafter, the "Memorandum"), authored by him, concerning wrongful conduct in which IBill was engaged and that he wanted to forward the Memorandum to Perfect 10 or Johnston.  Id.  Cherry told Johnston that providing the Memorandum to Perfect 10 would not breach any fiduciary duty Cherry

might have had to IBill. Id. Johnston told Cherry that he would not discuss the contents of the Memorandum with him or any communication between his former employer and him. Id., ¶ 3. Johnston specifically told Cherry not to disclose to Johnston any of the contents of the Memorandum to which he referred. Id., ¶ 3. Johnston told Cherry to forward the Memorandum to him in a sealed envelope. Id., ¶ 4. When Johnston received the Federal Express package, he placed the package in a safe without reading it. Id.

Subsequently, Johnston advised Cherry that he wanted him to confirm under oath his statements to Johnston that the Memorandum he forwarded to Johnston was not a privileged document. Id., ¶ 5. Johnston declares that as a result of this request, Cherry executed a declaration, under oath which confirmed Cherry's statements to him. See Johnston Decl., Exh. A. The declaration mentions the Memorandum but does not relate the contents of it. Id., ¶ 16.

F.    Cherry's Declaration Submitted in Support of Perfect 10's Opposition
      to IBill's Motion for Summary Judgment

Cherry prepared a declaration which was filed by Perfect 10 in support of Perfect 10's Opposition for Summary Judgment. See Johnston Decl., Exh. A.

G.    Defendants CWIE and CCBill

Jay Spillane and John Flynn, attorneys for Defendants CWIE and CCBill, have also submitted declarations that state that both attorneys discussed their litigation strategies and exchanged attorney work product with Cherry while he was employed at IBill. See Spillane Decl., ¶¶ 8-15 & Flynn Decl., ¶¶ 3-7.

12

## III.   LEGAL STANDARD

The Central District of California has adopted the California Rules of Professional Conduct at L. R. 83-3.1.2, and attorneys practicing in this court are required to adhere to those standards, as articulated in the rules and any court decisions interpreting them.[4] The right to disqualify counsel is within the discretion of the trial court as an exercise of its inherent powers. See United States v. Wunsch, 84 F.3d 1110, 1114 (9th Cir. 1996) (district court has inherent power to sanction unethical behavior); Image Technical Servs., Inc. v. Eastman Kodak Co., 820 F. Supp. 1212, 1215 (N.D. Cal. 1993) (incorporating California state law standard for disqualification of counsel in the Northern District); Cal. Code Civ. Proc. § 128(a)(5).

Motions to disqualify counsel are strongly disfavored. See, e.g., Gregori v. Bank of America, 207 Cal. App. 3d 291, 300-301 (1989) ("Motions to disqualify counsel often pose the very threat to the integrity of the judicial process that they purport to prevent."); In re Marvel, 251 B.R. 869, 871 (Bankr. N.D. Cal. 2000), aff'd 265 B.R. 605 (N.D. Cal. 2001) ("A motion for disqualification of counsel is a drastic measure which courts should hesitate to impose except when of absolute necessity. They are often tactically motivated; they tend to derail the efficient progress of

---

[4] Local Rule 83-3.1.2 states: "Standards of Professional Conduct–Basis for Disciplinary Action. In order to maintain the effective administration of justice and the integrity of the Court, each attorney shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decision of any court applicable thereto. These statutes, rules and decisions are hereby adopted as the standards of professional conduct, and any breach or violation thereof may be the basis for the imposition of discipline. The Model Rules of Professional Conduct of the American Bar Association may be considered as guidance."

litigation."). Thus, such requests "should be subjected to particularly strict judicial scrutiny." <u>Optyl Eyewear Fashion Int'l Corp. v. Style Cos.</u>, 760 F.2d 1045, 1050 (9th Cir. 1985) (citations omitted).

In reviewing a motion to disqualify counsel, the district court must make "a reasoned judgment and comply with the legal principles and policies appropriate to the particular matter at issue." <u>Gregori</u>, 207 Cal. App. 3d at 300 (citations omitted). The district court is permitted to resolve disputed factual issues in deciding a motion for disqualification and must make findings supported by substantial evidence. <u>Dept. of Corrections v. Speedee Oil Change Syst.</u>, 20 Cal. 4th 1135, 1143 (1999).

## IV.   ANALYSIS

Defendants IBill, CCBill, and CWIE argue that Perfect 10's counsel should be disqualified from this case because of the communications between Cherry and Perfect 10.  Perfect 10 argues that its counsel should not be disqualified because (1) Cherry is not a licensed attorney, (2) Cherry is a witness with knowledge of relevant facts in this case, and (3) none of the communications between Perfect 10 and Cherry resulted in the disclosure of attorney-client or attorney work-product information.

Defendants argue that Perfect 10's counsel should be disqualified because (1) Cherry has provided legal advice to both sides of the same litigation, (2) Perfect 10 acted improperly by not informing IBill that it had obtained privileged information, and (3) Defendants have been prejudiced because Perfect 10 has become privy to Defendants' litigation strategy.

A.   Cherry Is Not a Licensed Attorney

Perfect 10 argues that since Cherry is not a licensed attorney, his communications with Perfect 10 cannot be privileged.  Perfect 10 has submitted a declaration by Sean Morris which states that Perfect 10 has been unable to find any documentation that Cherry is a licensed attorney.  Morris Decl., ¶ 9-14.  Pursuant to California Evidence Code § 950, a "'lawyer' means a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation."  Cal. Evid. Code § 950 (2004) (emphasis added); see also Bay v. Superior Court, 7 Cal. App. 4th 1022, 1024 (Cal. Ct. App. 1992).  Therefore, regardless of whether Cherry is a licensed attorney, if IBill believed he was an attorney and communicated with him as such, the attorney-client privilege applies to communications between Cherry and IBill.  Perfect 10 relies on Financial Tech. Intern., Inc. v. Smith, 2000 WL 185131 (S.D.N.Y. 2000), to support its argument that a reasonable belief is not sufficient to form an attorney-client relationship.  However, that case interprets New York law and is therefore inapplicable to the case at bar.

IBill has submitted two declaration from Mark Persily, IBill's Vice-President of Legal Affairs, which state that Cherry performed numerous legal functions as IBill's counsel and that IBill believed that Cherry was an attorney.  See Persily Decl., ¶¶ 1-5; Supp. Persily Decl., ¶¶ 1-7.[5]  Based on these declarations, the Court finds that

_____

[5] During oral argument, one of Perfect 10's attorneys, Jeffrey Mausner, argued that Cherry's deposition, taken in connection with the impending civil case by IBill against Cherry, demonstrates that IBill did not have a reasonable belief that Cherry was an attorney while he was employed at IBill.  During the deposition Cherry asserted the Fifth Amendment privilege in response to almost every single question asked of him, including "Are you a member of the Florida bar?" and "Are you a member of any bar in the United States?"  Supp. Persily Decl., Exh. D, 15:7-

IBill reasonably believed that Cherry was its attorney.  Therefore, communications between Cherry and IBill were protected by attorney-client privilege.

B.   Did Cherry Provide Legal Services to Perfect 10?

Defendants argue that Cherry has provided legal advice to Perfect 10 and may have been "employed" by Perfect 10 as legal counsel. Defendants Perfect 10 counters that it never paid Cherry for any legal services and only paid Cherry to reimburse him for his travel expenses.  Perfect 10 has also submitted evidence that Perfect 10's counsel has never solicited legal advice from Cherry.

The Court has reviewed the emails submitted by the parties and finds that there is no evidence that Zadeh or Perfect 10's counsel solicited legal advice from Cherry. The emails also do not reveal that Cherry has provided any legal advice to Perfect 10. The emails only reveal Cherry's disclosure of facts related to IBill's conduct with regard to Perfect 10's claims.  Furthermore, IBill's allegations that Perfect 10 "paid" Cherry for his declarations in both this case and the Perfect 10 v. Net Management Services, Inc. case are unfounded and not supported by the evidence presented.

C.   Cherry is a Witness with Personal Knowledge of Facts

Perfect 10 argues that Cherry is a witness with personal knowledge of relevant

---

12. The Court finds that neither the questions nor the answers given by Cherry demonstrate that IBill did not have a reasonable belief that Cherry was an attorney. Furthermore, the deposition was taken on October 30, 2003, seven months after Cherry had resigned from IBill.  Id. at 5.  The deposition, consequently, bears no relation to IBill's beliefs regarding Cherry's status as an attorney while he was employed at IBill.  Therefore, the Court finds Mausner's arguments irrelevant.

facts in this case and, therefore, Perfect 10 was entitled to interview Cherry as a percipient fact witness. Perfect 10 also notes that IBill identified Cherry as one of its Federal Rule of Civil Procedure 26(a)(1) witnesses. <u>See</u> Mausner Decl., Exh. 3 at 1.

California Rule of Professional Conduct Rule 2-100 generally provides that an attorney should not communicate directly or indirectly about the subject of the representation with a party that the attorney knows is represented by counsel.[6] This rule generally only applies to current employees and not former employees of a corporate party. <u>Continental Ins. Co. v. The Superior Court</u>, 32 Cal. App. 4th 94, 118 (Cal. Ct. App. 1995). However, in cases where the former employee is privy to attorney-client privileged information, attorneys must be careful not to seek to induce the former employee to violate the attorney-client privilege. <u>See</u> <u>Union Pac. R.R. v. Mower</u>, 219 F.3d 1069, 1072 n.2 (9th Cir. 2000); <u>In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.</u>, 658 F.2d 1355, 1361 n.7 ("Again,

---

[6] California Rule of Professional Conduct Rule 2-100 states:

(A) While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer.
(B) For purposes of this rule, a "party" includes:
    (1) An officer, director, or managing agent of a corporation or association, and a partner or managing agent of a partnership; or
    (2) An association member or an employee of an association, corporation, or partnership, if the subject of the communication is any act or omission of such person in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

17

the attorney-client privilege is served by the certainty that conversations between the attorney and client will remain privileged after the employee leaves."); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 91-359 (1991) ("With respect to any unrepresented former employee, of course, the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the [attorney-client] privilege.").[7]  Therefore, Perfect 10's counsel, aware of the fact that Cherry was formerly IBill's in-house counsel, has an ethical responsibility to ensure that they do not seek or receive any attorney-client privileged information.

### D.    The Emails and Cherry's Declaration

In In re Fischel, 557 F.2d 209 (9th Cir. 1977), the Ninth Circuit set forth the essential elements of the attorney-client privilege:

(1) Where legal advice of any kind is sought

(2) from a professional legal adviser in his capacity as such,

(3) the communications relating to that purpose,

(4) made in confidence

(5) by the client,

(6) are at this instance permanently protected

(7) from disclosure by himself or by the legal adviser,

---

[7]  IBill relies on Zachair, Ltd. v. Driggs, 965 F. Supp. 741, 750-51 (D. Md. 1997), to support its argument that Perfect 10 should not have communicated with Cherry without IBill's consent.  However, the Zachair case interprets Maryland's Rules of Professional Conduct and is therefore inapplicable to the case at bar.  Id.

1    (8) unless the protection be waived.

3    557 F.2d at 211 (citing 8 Wigmore Evidence § 2292 at 554 (McNaughton rev.

4    1961)).[8] "The attorney-client privilege protects confidential disclosures made by a

5    client to an attorney in order to obtain legal advice as well as an attorney's advice in

6    response to such disclosures." In re Grand Jury Investigation, 974 F.2d 1068, 1070

7    (9th Cir. 1992) (citations omitted). "The party asserting the attorney-client privilege

8    has the burden of proving that the privilege applies to a given set of documents or

9    communications." Id. (citations omitted). "To meet this burden, a party must

10   demonstrate that its documents adhere to the essential elements of the attorney-client

11   privilege adopted by this court." Fischel, 557 F.2d at 211.

13   The Court has reviewed the email communications between Zadeh and Cherry

14   and finds that none of the emails fulfill all of the elements of attorney-client privilege

15   listed above.[9] The Court has also reviewed Cherry's declaration which was filed in

17   ─────────────

18   [8] IBill relies on a footnote In re Complex Asbestos Litig., 232 Cal. App. 3d 572, 593 n.8 (1991) to support its argument that the mental impressions of a party's attorney that have not been communicated to his client are protected by the attorney-client privilege. However, based on the Ninth Circuit's opinion in Fischel, attorney-client privilege would only attach to mental impressions or legal opinions which necessarily include confidential communications between and attorney and his client. See Fischel, 557 F.2d at 211.

24   [9] The Court is especially troubled by the January 13, 2004 email from Cherry to Zadeh in which Cherry tells Zadeh to ask IBill's employees whether they told Cherry "that large clients were not to have service interrupted, but instead were simply told to remove the images at their convenience." Baum Decl., Exh. D. Although this communication does not satisfy the requirements listed above because there is no evidence that the IBill employees told Cherry this information while seeking legal advice, there is certainly an inference the

support of Perfect 10's opposition to the Defendants' summary judgment motion. While the declaration does not disclose the content of any communications between Cherry and IBill, the declaration does contain legal conclusions regarding IBill's violations of copyright, trademark, and right of publicity laws. It is unclear whether Cherry came to those conclusions because of his role as a percipient fact witness or whether those conclusions arise from his service as IBill's in-house counsel. The Court finds, nonetheless, that the Defendants have not presented sufficient evidence that attorney-client privileged information was actually disclosed to Perfect 10 or its counsel. However, since it is unclear whether the legal conclusions stated in the declaration arose from Cherry's service as IBill's in-house counsel, IBill would not be able to cross-examine Cherry regarding the declaration without risking a waiver of its attorney-client privilege. The Court, therefore, finds that IBill will be prejudiced if Perfect 10 is allowed to use the Cherry declaration in support of its opposition to summary judgment or at trial and strikes the Cherry declaration.

E.    Attorney-Work Product

        There are two references to attorney-work product that may have been disclosed by Cherry to Perfect 10. The first is a memorandum that is referenced in Cherry's November 16, 2003 email to Zadeh in which he stated that he had drafted a compliance memorandum regarding the Visa rule. Baum Decl., Exh. N. However, there is no evidence that Cherry actually provided the memorandum or related the contents of the memorandum to Zadeh. Therefore, the Court cannot find that there was a disclosure of attorney-work product based on this email.

---

communication could have been privileged.

The second is the memorandum which Cherry mailed to Ronald Johnston. <u>See</u> Johnston Decl., ¶ 4. Johnston declares that he placed the memorandum in a safe without reading it and that none of Perfect 10's counsel has read the Memorandum. Therefore, the Court finds that although IBill's attorney work-product may have been produced to Perfect 10, there is no evidence that attorney work-product has been disclosed to Perfect 10. However, given the circumstances surrounding this Memorandum, the Court finds that the memorandum should be returned to IBill immediately to prevent the inadvertent disclosure of attorney-work product.

### F.   Defendants CCBill and CWIE

While it is clear that Cherry was privy to the attorney-client privileged information and attorney work product of Defendants CCBill and CWIE, the Defendants have not presented any evidence that Perfect 10 or its counsel has received any of their attorney-client privileged information.

### G.   Impropriety of the Communications Between Perfect 10 and Cherry

Canon 9 of the ABA Code requires that attorneys avoid the appearance of impropriety. In the Ninth Circuit, Canon 9 alone can be the basis for the disqualification of an attorney. <u>See</u> <u>In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.</u>, 658 F.2d 1355, 1360 (9th Cir. 1981). "In order that the court may in fact control the conduct of attorneys appearing before it, the court should have the ability to disqualify attorneys if their conduct actually interferes with the integrity of the Court, or actually produces an appearance of impropriety." <u>Id.</u> at 1361. However, a disqualification based on Canon 9 may only be made where

1   "the impropriety is clear and is one that would be recognized as such by all

2   reasonable persons." Id. "The impropriety must affect the public's view of the

3   judicial system or the integrity of the court." Id.

4       The Court finds that Perfect 10's conduct does not rise to a level requiring

5   disqualification. Defendants have not demonstrated that their privileged information

6   has been disclosed to Perfect 10 or its counsel or that they have been prejudiced by

7   the communications between Cherry and Perfect 10. However, the Court does find

8   that Perfect 10's conduct was less than forthright and skated dangerously close to

9   professional impropriety. The Court reminds Perfect 10 that Canon 9 of the ABA

10  prescripts the behavior of attorneys and requires them to avoid even the appearance

11  of impropriety.

12

13      Perfect 10 has suggested that the Court issue a protective order that defines the

14  scope of Perfect 10's future contact with Cherry as an alternative to disqualification.

15  The Court finds that a protective order would safeguard many of IBill's concerns

16  regarding this matter. Therefore, the Court requests that Defendant IBill draft a

17  protective order defining the scope of Perfect 10's future contact with Cherry for the

18  Court's review. Defendants CWIE and CCBill may participate in the drafting of the

19  protective order insofar as it addresses the scope of Perfect 10's future contact with

20  Cherry with regards to CCBill and CWIE. The Court also finds, in an abundance of

21  caution, that the Memorandum provided by Cherry to Perfect 10 should immediately

22  be sent to Defendant IBill to avoid the disclosure of IBill's attorney-work product to

23  Perfect 10.

24

25

26

27

28

1    **V.    CONCLUSION**

3         Defendant IBill's motion to disqualify Perfect 10's counsel is DENIED.

4         Defendant IBill shall draft a protective memo that defines the scope of Perfect

5    10's future contact with Cherry for the Court's review. Defendants CWIE and CCBill

6    may participate in the drafting of the protective order insofar as it addresses the scope

7    of Perfect 10's future contact with Cherry regarding CCBill and CWIE. Defendants

8    shall file the proposed protective order no later than April 27, 2004.

9         Perfect 10 shall mail or deliver the Memorandum, in its original Federal

10   Express envelope, to IBill within seven days of the issuance of this Order.

11        The August 6, 2003 Cherry declaration is stricken.

**IT IS SO ORDERED.**

Dated: *April 13, 2004*

                                    *[signature]*
                                    **LOURDES G. BAIRD**
                                    **United States District Judge**