FILED
CLERK, U S DISTRICT COURT

JUN 22 2004

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

___ Priority
_✓_ Send
___ Clsd
_✓_ Enter
___ JS-5/JS-6
___ JS-2/JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERFECT 10, INC.,<br><br>            Plaintiff,<br><br>   v.<br><br>CCBill, LLC, et al.,<br><br>            Defendants. | NO. CV 02-7624 LGB (SHx)<br><br>**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

## I.   INTRODUCTION

Defendants Internet Billing Co., LLC ("IBill"), Internet Key, Inc. ("Internet Key"), Cavecreek Wholesale Internet Exchange ("CWIE"), and CCBill, LLC ("CCBill") have filed the instant motions for partial summary judgment of Perfect 10, Inc.'s ("Perfect 10") copyright, RICO, and state law claims based on safe harbors provided by the Digital Millennium Copyright Act ("DMCA") and immunity provided by the Communications Decency Act ("CDA"). By this Order, the Court

1

DOCKETED ON CM

JUN 25 2004

BY_____ 015

addresses the four motions for partial summary judgment.[1]

## II.    FACTUAL AND PROCEDURAL HISTORY

### A.    Factual History

The facts are undisputed unless otherwise noted.

#### 1.    *Perfect 10*

Perfect 10 is the publisher of the adult entertainment magazine Perfect 10 and the owner of the website perfect10.com. <u>See</u> II Zadeh Decl. at ¶ 2. Perfect 10 has created approximately 5,000 photographic images for display in its magazine and on its website. <u>See id.</u> at ¶ 17. Perfect 10 holds registered U.S. copyrights for these images. <u>See id.</u>; <u>see also</u> Compl. Exh. O (containing copies of the copyright registrations owned when the complaint was filed). In addition, Perfect 10 has several registered trademark/service marks. <u>See</u> II Zadeh Decl. at ¶ 18; <u>see also</u> Compl. Exh. P (containing copies of trademark registrations owned when the complaint was filed). Finally, Perfect 10 is the assignee of the rights of publicity of many models. <u>See</u> II Zadeh Decl. at ¶ 19-21.

#### 2.    *IBill*

IBill is a company that processes payments for online merchants. II Zadeh Decl. at

---

[1]   The Court has devised the following citation nomenclature to distinguish the pleadings filed in support of the different motions: (1) all pleadings filed in support of Internet Key's motion against Perfect 10 shall be preceded by an "I"; (2) all pleadings filed in support of IBill's motion against Perfect 10 shall be preceded by an "II"; (3) all pleadings filed in support of CCBill's and CWIE's motions against Perfect 10 shall be preceded by an "III."

1    ¶ 22.  IBill has nearly 5,000 clients with over 70,000 websites.  II Smith Decl. at ¶4.

2    All material selected and posted by IBill's clients' websites is selected and posted by

3    IBill's clients.  Id., ¶ 7.  IBill can suspend or terminate its relationship with websites

4    if it becomes aware that the website is violating IBill's policies or state or federal law.

5    Id., ¶ 8.  When IBill suspends or terminates a client, the contents of the clients'

6    website remains intact and unchanged.  Id., ¶ 9  In addition, suspension or termination

7    does not affect the ability of the website's existing customers (those who have already

8    paid) to obtain access to the website.  Id.  Suspension or termination does, however,

9    prevent the owner of the website from receiving new payments using IBill's payment

10   processing services.  Id.

11

12          3.    *Internet Key*

13

14          Hank Freeman is the President of Internet Key.  I Freeman Decl., ¶ 1; I Cooper

15   Decl., Exh. 1 (Freeman Depo.), at 15:10-20.[2]  Internet Key is an age verification

16   system for adult content websites.  I Freeman Decl., ¶ 2.  Starting in 1997, Internet

17   Key has provided adult verification services, including providing links, to third-party

18   adult content websites.  Id.  Currently, Internet Key verifies age and provides a link

19   to approximately 30,000 third-party adult content websites that participate in the

20   SexKey system ("Affiliated Websites").  Id.  The Affliated Websites are not owned

21   by Internet Key although some are owned by employees of WCD Enterprises, another

22   company that Freeman owns.  Id., ¶ 4; I Cooper Decl., Exh. 1 (Freeman Depo.), at

23   119:1-5.  A user (consumer) cannot access an Affiliated Website without proving he

24   or she is of legal age.  I Freeman Decl., ¶ 5.  Internet Key provides each Affiliated

25

26   _____

27          [2] The deposition contains two different sets of page
     numbers.  The Court will refer to the original deposition pages
28   found on the bottom right-hand side of the pages, not the exhibit
     page numbers found at the bottom middle of the pages.

3

1  Website with a site ID and an HTML code to place on their site. <u>Id.</u> When a new
2  user clicks onto an Affiliated Website, a link that tracks the site ID automatically
3  directs the user to sexkey.com for age verification. <u>Id.</u> The user is directed to
4  Internet Key's registration page, which contains Internet Key's User Agreement. <u>Id.</u>,
5  ¶ 6. The User Agreement sets forth terms and conditions that a user must certify and
6  agree in order to subscribe to a SexKey membership. <u>Id.</u> Once the user agrees to all
7  the terms of the User Agreement by checking on a box that the user agrees, the user
8  is is provided a user password to access all of the Affiliated Websites in the SexKey
9  system. <u>Id.</u>, ¶ 8. Internet Key does not store the content of the Affiliated Websites
10 on its computer system. <u>Id.</u>, ¶ 13. It only stores information related to the Affiliated
11 Websites' URLs, site descriptions and webmaster information. <u>Id.</u>

12      Prior to January 22, 2004, the only website Internet Key owned was
13 sexkey.com. <u>Id.</u>, ¶ 12. On January 22, 2004, Internet Key started a new website
14 called sksignature.com, which is part of the SexKey system. <u>Id.</u> Internet Key owns
15 or leases all the content contained on sksignature.com. <u>Id.</u>[3]

16      Internet Key also acts as a search engine (similar to Yahoo or Google) for free
17 adult content on the Internet. I Freeman Decl., ¶ 4. Sometimes, when an Affiliated
18 Website is accessed through SexKey, the words "sexkey.com" appear in the URL.
19 I Zadeh Decl., ¶ 65, Exh. 51. Internet Key did not adopt a DMCA policy until August
20 21, 2002. I Cooper Decl., ¶ 4, Exh. 2 at 27.

21
22          4.    *CWIE*
23
24      Thomas Fisher is the Executive Vice-President of CWIE.  III CWIE Fisher
25
26
27 _____
28      [3] Perfect 10 has not alleged any infringements on
   www.sksignature.com.  <u>Id.</u>

Decl., ¶ 1.[4]  CWIE is a provider of web hosting and related Internet connectivity services. Id., ¶ 3.  CWIE provides what is referenced within the industry as "ping, power, and pipe." Id.  As a provider of Internet access, website hosting, and other Internet-related services, CWIE offers its clients, and their customers and users, the means to acquire and disseminate public, private, commercial, and non-commercial information. Id.  "Ping, power, and pipe" refers respectively to ensuring the "box" or server is on, ensuring power is provided to the server, and connecting the client's server or website to the Internet backbone via a data center connection. Id.

CWIE's clients are the creators and/or owners of the content they seek to present to consumers via their website. Id., ¶ 4.  CWIE is not in the business of producing, designing, supervising or editing the content that appears on CWIE's clients' websites. Id.  CWIE adopted its repeat infringer policy in 1999. Id., ¶ 11. CWIE's termination policy states that:

> Engaging in any activity that infringes or misappropriates the intellectual property rights of others is prohibited.  This includes copyrights, trademarks, service marks, trade secrets, software piracy, and patents held by individuals, corporations, or other entities. Engaging in activity that violates privacy, publicity, and other personal rights of others is likewise prohibited.  CWIE is required by law to remove or block access to client content upon receipt of a proper notice of copyright infringement or other violations of the law.  It is also CWIE's policy to terminate the privileges of clients who commit repeat

---

[4] Perfect 10 contends that CWIE and CCBill are both owned by CWIE Holdings, LLC.  III Zadeh Decl., ¶ 233, Exh. 202.  Perfect 10 has submitted a chart that it received from CCBill or CWIE that does not identify, in any manner, common corporate ownership.  Therefore, this contention is not supported by the evidence presented.

5

1    violations of copyright laws.

2

3   III CWIE Fisher Decl., ¶ 9, Exh. A, at 1-2.

4

5         5.    *CCBill*

6

7         Thomas Fisher is the Executive Vice-President of CCBill.  III CCBill Fisher

8   Decl., ¶ 1.  CCBill's clients are the creators and/or owners of the content they seek

9   to present to consumers via the Internet.  Id., ¶ 3.  CCBill is not in the business of

10  producing, designing, supervising or editing the content that appears on CCBill's

11  clients' websites.  Id.  CCBill provides a fully automated Internet service that enables

12  consumers to use credit cards or checks to pay for subscriptions or memberships to

13  e-commerce venues created and offered by CCBill's clients.  Id.  CCBill does not

14  own or operate any site for which a subscription or membership is required.  Id.  As

15  part of its services to its clients, CCBill provides an automated on-line accounting

16  mechanism that clients may use to verify statistical and financial activities processed

17  for them through CCBill's on-line Internet automated transaction processing system.

18  Id.  Consumers who have joined a client's venue may cancel their subscription via an

19  email or telephone call directed to CCBIll.  Id.

20        CCBill has a repeat infringer policy, adopted in 1999, which states:

21

22        As an ISP, CCBill follows the procedures prescribed by the Digital

23        Millenium Copyright Act (DMCA) for notification, takedown, and

24        counter-notification.  If you believe that a CCBill client has something

25        on a website that constitutes a [violation] of your copyrights, or if any

26        of your other intellectual property rights [have been] violated, please

27        provide the following information to CCBill's Registered [DMCA

28        Agent].

          1.    Your electronic or physical signature.

6

2.    A description of the copyrighted work and where the original work [is located].

3.    A description of where the infringement is located.

4.    Your address, telephone number, and email address.

5.    A statement by you that you have a good faith belief that the use is not authorized by the copyright owner, agent, or the law.

6.    A statement by you, that under penalty of perjury, that the [above] is accurate and that you are the copyright owner or authorized [to act] on the owner's behalf.

Please send all legal notices to . . .

Id., ¶ 9, Exh. D.

**B.    Procedural History**

Plaintiff Perfect 10 filed its Complaint against Defendants CCBill, IBill, Paycom Billing Services, Inc., IMA Enterprises, Inc., Clarence Coogan, U. Berger, Cybertech Communications, NV, Celebskank, Network Authentication Systems Corporation, CWIE, Netpass Systems, Inc., and Internet Key on September 30, 2002. The Complaint alleges the following claims against all of the Defendants:

Claim 1: federal copyright infringement;

Claim 2: federal trademark infringement;

Claim 3: federal trademark disparagement;

Claim 4: wrongful use of registered mark under California state law;

Claim 5: violation of right of publicity under California state law;

Claim 6: unfair competition under California Business & Professions Code §§ 17200 and under the Lanham Act § 43(a);

Claim 7: false and misleading advertising pursuant to California

1               Business & Professions Code §§ 17500 and the common law;

2               Claim 8: RICO (investment of proceeds); and

3               Claim 9: RICO (participation in criminal enterprise).

4

5  See Compl.

6       On October 16, 2003, the Court ordered the bifurcation of discovery in this

7  case. See October 16, 2003 Minute Order. The first phase of discovery was to relate

8  solely to the Defendants' defenses to the claims under the CDA and the DMCA. Id.

9  Phase I discovery was closed on January 16, 2003. See November 17, 2003 Minute

10 Order, at 2.

11      The parties have filed evidentiary objections in connection with the motions

12 for summary judgment. The Court will only address the objections to the evidence

13 that is relevant to the Court's analysis.

14

15 III.  **LEGAL STANDARD**

16

17      Rule 56 of the Federal Rules of Civil Procedure provides that a court shall

18 grant a motion for summary judgment if "the pleadings, depositions, answers to

19 interrogatories, and admissions on file, together with the affidavits, if any, show that

20 there is no genuine issue as to any material fact and that the moving party is entitled

21 to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that

22 may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

23 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence

24 for a reasonable jury to return a verdict for the nonmoving party. Id.

25      The party moving for summary judgment bears the initial burden of informing

26 the district court of the basis of the summary judgment motion and of demonstrating

27 the absence of a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477

28 U.S. 317, 323 (1986); Katz v. Children's Hosp. of Orange County, 28 F.3d 1520,

     1534 (9th Cir. 1994). On an issue for which the nonmoving party has the burden of

1  proof at trial, the moving party need only point out "that there is an absence of
2  evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.

3      Once this initial burden is satisfied, the non-moving party is required to "go
4  beyond the pleadings and by her own affidavits, or by the depositions, answers to
5  interrogatories, and admissions on file, designate 'specific facts' showing that there
6  is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324 (internal quotations omitted);
7  <u>see also Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec</u>,
8  854 F.2d 1538, 1544 (9th Cir. 1988). Where the standard of proof at trial is
9  preponderance of the evidence, the non-moving party's evidence must be such that
10 a "fair-minded jury could return a verdict for the [non-moving party] on the evidence
11 presented." <u>Anderson</u>, 477 U.S. at 252.

12     The court views all facts and draws all inferences therefrom in the light most
13 favorable to the nonmoving party. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654,
14 655(1962). The Court must accept the plaintiff's view of all material disputed facts.
15 <u>LaLonde v. County of Riverside</u>, 204 F.3d 947, 954 (2000). If, however, the
16 nonmoving party's evidence is "merely colorable" or "not significantly probative,"
17 summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50.

18

19 **IV.   ANALYSIS**

20     A.   <u>Digital Millennium Copyright Act</u>

21

22     "The DMCA was enacted both to preserve copyright enforcement on the
23 Internet and to provide immunity to service providers from copyright infringement
24 liability for "passive," "automatic" actions in which a service provider's system
25 engages through a technological process initiated by another without the knowledge
26 of the service provider. H.R. Conf. Rep. No. 105-796, at 72 (1998), reprinted in 1998
27 U.S.C.C.A.N. 649; H.R. Rep. No. 105-551(I), at 11 (1998)." <u>ALS Scan, Inc. v.</u>
28 <u>RemarQ Cmtys., Inc.</u>, 239 F.3d 619, 625 (4th Cir. 2001). This immunity, however, is
   not presumptive, but granted only to "innocent" service providers who can prove they

do not have actual or constructive knowledge of the infringement, as defined under any of the three prongs of 17 U.S.C. § 512(c)(1). Id. The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, i.e., at the moment it becomes aware that a third party is using its system to infringe. Id. At that point, the Act shifts responsibility to the service provider to disable the infringing matter, preserving the strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital network environment. Id. (citations omitted). In the spirit of achieving a balance between the responsibilities of the service provider and the copyright owner, the DMCA requires that a copyright owner put the service provider on notice in a detailed manner but allows notice by means that comport with the prescribed format only "substantially," rather than perfectly. Id.

The Digital Millenium Copyright Act ("DMCA") creates a "safe harbor" for internet service providers who satisfy the requirements of the statute – protecting them against suits for damages and most injunctive relief. See generally, 17 U.S.C. § 512. There are four separate safe harbors within § 512, each with its own separate requirements. See 17 U.S.C. § 512(a),(b),(c)(1),(d). However, a threshold requirement for any protection by the DMCA is satisfaction of the requirements in § 512(i). The section reads as follows:

> The limitations on liability established by this section shall apply to a service provider only if the service provider– (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and (B) accommodates and does not interfere with standard technical measures.

17 U.S.C. § 512(i)(1).[5] Unless this threshold requirement is met, further analysis of the specific safe harbors is not required.

The Ninth Circuit has held that § 512(i)(1)(A) has three separate requirements. See Ellison v. Robertson, 357 F.3d 1072, 1080 (9th Cir. 2004). Service providers must: (1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform their clients of the policy. Id.

The courts have not defined what reasonable implementation of a repeat infringer policy entails. Since the purpose of the DMCA is to relieve internet service providers of the duty of patrolling the Internet for copyright infringements that are not immediately apparent or of which they have no actual knowledge, the DMCA requires that copyright owners inform internet service providers of infringements on the client websites of the internet service providers. See § 512(c)(1)(A) and § 512(c)(3). General or vague allegations of copyright infringements are not sufficient to place internet service providers on "notice" of potential copyright infringements. The DMCA provides requirements for proper notification of possible copyright infringements in § 512(c)(3)(A). See § 512(c)(3)(A).[6] The purpose behind the notice

_____

[5] There is no dispute between the parties that the Defendants fulfill the requirements of subsection (B).

[6] § 512(c)(3) states:

(3) Elements of notification.
    (A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:
        (i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.
        (ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.
        (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be

1    requirement under the DMCA is to provide the internet service provider with

2    adequate information to find and examine the allegedly infringing material

3    expeditiously. Hendrickson v. Amazon.com, Inc., 298 F. Supp. 2d 914, 917 (C.D.

4    Cal. 2003). "Under the DMCA, a notification from a copyright owner that fails to

5    comply substantially with § 512(c)(3) 'shall not be considered . . . in determining

6    whether a service provider has actual knowledge or is aware of the facts or

7    circumstances from which infringing activity is apparent." Hendrickson v.

8    Amazon.com, Inc., 298 F. Supp. 2d 914, 917-18 (C.D. Cal. 2003). In order for a

9    notification to be "DMCA-compliant," it should substantially fulfill the requirements

10   of § 512(c)(3)(A). ALS Scan, Inc. v. Remarq Communities, Inc., 239 F.3d 619, 625

11   (4th Cir. 2001).[7] Absolute compliance is not required. Id.

---

    disabled, and information reasonably sufficient to permit
    the service provider to locate the material.
        (iv) Information reasonably sufficient to permit the
    service provider to contact the complaining party, such as
    an address, telephone number, and, if available, an
    electronic mail address at which the complaining party may
    be contacted.
        (v) A statement that the complaining party has a good
    faith belief that use of the material in the manner
    complained of is not authorized by the copyright owner, its
    agent, or the law.
        (vi) A statement that the information in the
    notification is accurate, and under penalty of perjury, that
    the complaining party is authorized to act on behalf of the
    owner of an exclusive right that is allegedly infringed.


    [7] During oral argument, Perfect 10 argued that notifications
    of repeat infringers under § 512(i) did not have to meet the
    requirements of § 512(C)(3)(A) based on In re Aimster Copyright
    Litigation, 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002). In
    Aimster, the district court found that the DMCA did not require
    that a copyright holder provide Aimster with the internet
    protocol address of the infringement on the Aimster system. Id.
    An internet protocol address is the numeric address given to
    servers and users connected to the Internet. The district court
    did not, however, hold that DMCA notifications under § 512(i) do
    not need to meet the requirements of § 512(C)(3)(A). Therefore,
    Perfect 10's reliance Aimster to support its argument is
    misplaced.

1      Therefore, an internet service provider who receives repeat notifications that

2  substantially comply with the requirements of § 512(c)(3)(A) about one of its clients,

3  but does not terminate its relationship with the client, has not reasonably implemented

4  a repeat infringer policy.

5

6           1.    *IBill's Motion for Summary Judgment on Perfect 10's Copyright*

7                 *Claim*

8

9      IBill argues that Perfect 10's Claim 1 for copyright infringement is barred by

10  § 512(a) of the DMCA. Perfect 10 opposes summary judgment because, among other

11  reasons, it contends that IBill has not met the requirements for terminating repeat

12  infringers as required by § 512(i).

13

14           a.    **Threshold Requirements Under § 512(i)**

15

16      The crux of the dispute between Perfect 10 and IBill is whether the policy

17  adopted by IBill provided for termination of repeat infringers in appropriate

18  circumstances and whether that policy was reasonably implemented.[8]

19

20            i.    *Policy for Termination of Repeat Infringers*

21

22      IBill argues that its policy terminated repeat infringers in appropriate

23  circumstances. IBill states that its policy is that when it receives a notice of copyright

24  infringement that substantially complies with the requirements of the DMCA, IBill

25  suspends payment processing services to that client. See II De Vito Decl. at ¶ 26. If

26  IBill determines that it has received previous complaints about that client or the

27

28       [8] There is no dispute between the parties that IBill is an
internet service provider under the DMCA. There is also no
dispute between the parties that IBill adopted its termination
policy before the alleged infringements occurred.

1   website, IBill terminates the account permanently. See id. Perfect 10 argues that

2   IBill's policy does not terminate repeat infringers in appropriate circumstances

3   because it suspends services for particular websites without terminating the

4   webmasters responsible for that material. Therefore, Perfect 10 argues that IBill's

5   policy does not provide for the termination of service access for repeat copyright

6   infringers. Perfect 10 also argues that IBill has not reasonably implemented its policy

7   because repeat infringers known to IBill were not terminated.

8       The focus of § 512(i) is on infringing users rather than on content. See Perfect

9   10 v. Cybernet Ventures, Inc., 213 F.Supp 2d 1146, 1177 (C.D. Cal. 2002); see also

10  CoStar Group, Inc. v. Loopnet, Inc., 164 F. Supp. 2d 688, 704 (D. Md. 2001).

11  Therefore, an internet service provider that seeks to fall within the safe harbors

12  provided by the DMCA, must adopt a policy that terminates the infringing user, not

13  just the content. IBill has submitted several versions of its infringement policy, the

14  most recent of which states:

15

16       IBill may, its discretion (sic), disable and/or terminate the accounts of

17       any IBill client who is accused of infringing the rights of others.

18       If you believe that your work has been copied in a way that constitutes

19       copyright infringement, or your intellectual property rights have been

20       otherwise violated, please provide IBill's Copyright Agent the following

21       information:

22       1.    an electronic or physical signature of the person authorized to act

23             on behalf of the owner of the copyright;

24       2.    a description of the copyrighted work, and a description of where

25             the work is located;

26       3.    your address, telephone number, and email address;

27       4.    a statement by you that you have a good faith belief that the use

28             of the work is not authorized by the copyright owner, agent, or the

              law;

       5.    a statement by you, that under penalty of perjury, that the above

1    information is accurate and that you are the copyright owner or
2    authorized to act on the owners's behalf.
3    Please send such notice to . . .

4

5    II Devito Decl., Exh. B, at 40 (Copyright Policy, 12/9/03). The Court notes that this
6    policy states that it will terminate or disable the accounts of IBill clients who are
7    accused of infringing third-party copyrights. Therefore, there is no genuine issue of
8    material fact that IBill has adopted a policy that terminates repeat infringers in
9    appropriate circumstances.

10

11                    ii.    *Reasonable Policy Implementation*

12

13           Perfect 10 contends that IBill has not reasonably implemented its policy. IBill
14    replies that its DMCA immunity cannot be defeated by individual instances of non-
15    enforcement because Congress requires reasonable implementation of the policy
16    rather than perfect implementation. IBill also argues that it had no legal obligation
17    under § 512(i) unless the notices of infringement were substantially DMCA
18    compliant. IBill is correct that Congress requires reasonable implementation of a
19    repeat infringer policy rather than perfect implementation. See 17 U.S.C. §
20    512(i)(1)(A). During oral argument, Perfect 10 argued that there is a genuine issue
21    of material fact that IBill does not reasonably implement its repeat infringer policy
22    because IBill has failed to produce its DMCA-notice log. However, the DMCA does
23    not require the internet service provider to keep a log of its notifications. IBill has
24    submitted the actual DMCA-notifications it has received which are sufficient to
25    demonstrate that IBill tracks its notifications. II DeVito Decl., Exhs. P-T.

26           Perfect 10 has submitted notifications that Perfect 10 or its counsel sent to IBill
27    of infringements of Perfect 10's copyrights. II Zadeh Decl., ¶ 29, Exhs. 19-33.
28    Exhibit 19 is an email dated August 24, 2001, sent from Perfect 10's counsel to IBill,
     which identifies 12 websites that are IBill clients which Perfect 10 states have
     infringements of Perfect 10's and third-party copyrights. II Zadeh Decl., Exh. 19 at

15

1    204.  The email only identifies the websites that contain the allegedly infringing
2    material, it does not identify the URLs of the images nor does it identify which of
3    Perfect 10's images are being infringed.  Under § 512(c)(3)(A)(ii) and (iii), DMCA-
4    compliant notification must identify the copyrighted work claimed to have been
5    infringed and the material that is claimed to be infringing with "information
6    reasonably sufficient to permit the service provider to locate the material."  This
7    notification does not fulfill either of those requirements because it does not identify
8    Perfect 10's images or give IBill sufficient information to locate the infringing
9    material.  These websites may contain more than one hundred images at different
10   URLs; it is Perfect 10's responsibility, under the DMCA, to provide IBill with enough
11   information to allow IBill to locate the infringing material.  The Court finds that the
12   August 21, 2001 email does not substantially comply with the requirements of the
13   DMCA and therefore, does not constitute proper notification under § 512(c)(3)(A).

14        The next notification is an email from Norman Zadeh, the President of Perfect
15   10, dated August 28, 2001 which identifies a Perfect 10 copyrighted image that
16   appeared  on  celebclub.com  on  August  19,  2001  by  its  URL,
17   celebclub.com/parto/New/080301/Kovari-Kristina/nif.gif.  II Zadeh Decl., Exh. 21
18   at 209.  This email identifies one image by its URL in a manner that allows IBill to
19   locate the infringing email.  Although it does not comply with any of the other
20   requirements of § 512(c)(3)(A), it does provide IBill with sufficient information to
21   locate the allegedly infringing material and, as such, substantially fulfills the
22   requirements of § 512(c)(3)(A).

23        Exhibits 20 and 22-33 all suffer from the same deficiencies as Exhibit 19.
24   They contain emails from Norman Zadeh to IBill that make general allegations of
25   copyright infringement and do not provide the exact location of the infringing images
26   and do not identify the Perfect 10 images that are being infringed.  II Zadeh Decl.,
27   Exh. 20, 22-33.  IBill notes this problem in one of its emails to Norman Zadeh which
28   states: "The point I am trying to make is that without an URL (www.***.com) I

1   cannot attempt to figure out each URL." II Zadeh Decl., Exh. 29 at 220.[9]

2   Perfect 10 also argues that "[d]espite the fact that Perfect 10 complained to

3   IBill about the website femalecelebrities.com on at least 7 separate occasions, a

4   Concordance electronic search of IBILL's document production revealed only two

5   documents containing the term "femalecelebrities.com." II Zadeh Decl., ¶ 89.

6   However, Perfect 10 has not identified the DMCA-compliant notification that Perfect

7   10 sent to IBill notifying IBill of infringements on femalecelebrities.com. Therefore,

8   the Court finds that this evidence is not probative of IBill's failure to reasonably

9   implement its repeat infringer policy.

10   Therefore, Perfect 10 has only identified a single notification, the email dated

11   August 28, 2001, that provides IBill with sufficient notification to locate an allegedly

12   infringing image on the website celebclub.com. On August 27, 2001, IBill sent

13   Perfect 10 an email stating that celebclub.com's IBill account was suspended. II

14   DeVito Decl., Exh. T at 186. In IBill's interrogatory responses, IBill admitted that

15   celebclub was a client of IBill as of September 30, 2003. II Zadeh Decl., Exh. 16 at

16   169. Perfect 10 has not presented the Court with any evidence to demonstrate that the

17   infringing image remained on celebclub.com after IBill received the August 28, 2001

18   notification.

19   The Court finds that, as to Perfect 10's copyrights, Perfect 10 has not raised a

20   genuine issue of material fact that IBill did not reasonably implement its repeat

21   infringer policy or that IBill has not met the threshold requirements in § 512(i).[10]

22   _____

23   [9] Perfect 10 has also submitted a letter to IBll that
     accompanied a 22,000 page document production to IBill as

24   notification. The letter is almost identical to the letters sent
     to Internet Key, CCBill, and CWIE. The letter is discussed in

25   Sections III.A.2.b.ii, *infra*.

26   [10] Perfect 10 has also submitted documents referring to

27   alleged violations of the rights of publicity of celebrities on
     IBill's clients' websites and violations of third-party

28   copyrights. IBill is asserting the safe harbor provision under
     § 512(a) as a defense to Perfect 10's Claim 1 for copyright
     infringement. Perfect 10's Claim 1 for copyright infringement
     alleges violations of Perfect 10's copyrights. Evidence of
     infringements of third-party copyrights and violations of the

b.      **Safe Harbor Under § 512(a)**

IBill argues that it falls within the safe harbor in § 512(a) which provides:

a) Transitory digital network communications. A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections, if--

    (1) the transmission of the material was initiated by or at the direction of a person other than the service provider;

    (2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;

    (3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;

---

right of publicity are not relevant to Perfect 10's claim for copyright infringement.

   During oral argument, Perfect 10 argued that notices of third-party copyrights should be considered by the Court in determining whether IBill reasonably implements its termination policy.  To support its argument, Perfect 10 relies on Ellison v. Robertson, 357 F.3d 1072, 1080 (9th Cir. 2004), which held that AOL had not reasonably implemented its termination policy because the email address of AOL's copyright agent was inactive and therefore, notifications of copyright infringement went unheeded. Ellison did not hold that notifications of third-party infringements should be considered in determining whether AOL had reasonably implemented its termination policy.  Therefore, Perfect 10's reliance on Ellison is misplaced.

(4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and

(5) the material is transmitted through the system or network without modification of its content.

17 U.S.C. § 512(a).

Perfect 10 argues that IBill does not fall within the safe harbor provided in § 512(a) because it does not transmit the infringing material at issue in this case. Perfect 10 argues that § 512(a) only provides protection for internet service providers that transmit the allegedly infringing material, not other material, such as credit card information. Perfect 10 relies on In re Aimster Litigation, 252 F. Supp. 2d 634, 659-660 (N.D. Ill. 2002), to support its argument.

Perfect 10 relies on the section of § 512(a) that refers to the transmission of the material; it has failed, however, to address the section of § 512(a) which refers to the provision of a connection to the material.  The section provides that "an internet service provider shall not be liable . . . for infringement of copyright by reason of the provider's . . . providing connections for material through a system or network controlled or operated by or for the service provider, or . . ." § 512(a).  IBill provides a connection to the material on its clients' websites through a system which it operates in order to provide its clients with billing services.

Perfect 10's reliance on In re Aimster Litigation is misplaced because that case dealt with the transmission of material, not the provision of a connection to the material.  See In re Aimster Litigation, 252 F. Supp. 2d at 659-660.  The Court finds that there is no genuine issue of material fact that IBill has met the requirements of § 512(i) and § 512(a).

1    Therefore, the Court grants IBill's motion for summary judgment and finds that

2    IBill is entitled to protection under the safe harbor provided in § 512(a).

3

4           2.     *Internet Key's Motion for Summary Judgment on Perfect 10's*

5                  *Copyright Claim*

6

7    Internet Key contends that it is entitled to summary judgment on Perfect 10's

8    Claim 1 for copyright infringement because the claim falls within the safe harbor

9    provided by the DMCA under § 512(d).  Perfect 10 counters that Internet Key does

10   not fall within the safe harbors provided by the DMCA because Internet Key has not

11   adopted and implemented a reasonable repeat infringer policy.

12   As a preliminary matter, the Court notes that Perfect 10 has submitted evidence

13   of infringements on Internet Key's Affiliate Websites that were displayed on the

14   Internet prior to August 21, 2002 when Internet Key implemented its DMCA policy.

15   See, e.g., I Zadeh Decl., ¶ 43, Exh. 33.  Internet Key has not submitted a DMCA

16   policy that was provided to its clients prior to August 2002 as required under § 512(i).

17   Therefore, Internet Key has not met the threshold requirements of § 512(i) for the

18   period before August 2002 and Perfect 10 may maintain its claim for copyright

19   infringement that occurred prior to August 21, 2002.

20

21          a.     **Direct Infringement**

22

23   Perfect 10 argues that Internet Key is not entitled to protection under the

24   DMCA because it is a direct copyright infringer and therefore, not merely an internet

25   service provider.  Perfect 10's basis for this argument is that since some of the

26   employees of WCD Enterprises, which is also owned by Freeman, own some of the

27   Affiliate Websites, Internet Key is liable for the infringements on those websites.

28   Perfect 10 relies on H.A.S. Loan Serv., Inc. v. McColgan, 21 Cal. 2d 518, 523 (1943),

     to support its argument that a corporate entity cannot avoid liability when it splits its

     business functions with another related corporation and that Internet Key should be

20

1    considered the alter ego of WCD Enterprises.  An alter ego theory of liability would

2    require Perfect 10 to demonstrate, as its prima facie case (1) that there is such unity

3    of interest and ownership that the separate personalities of [two entities] no longer

4    exist and (2) that failure to disregard [their separate identities] would result in fraud

5    or injustice." American Tel. & Telegraph Co. v. Compagnie Bruxelles Lambert, 94

6    F.3d 586, 591 (9th Cir. 1996).  The fact that some of the Affiliate Websites are owned

7    by the employees of a separate company which is owned by the President of Internet

8    Key does not raise a genuine issue of material fact that there is such unity of interest

9    and ownership that the separate personalities of Internet Key and WCD Enterprises

10   no longer exist.  Furthermore, Perfect 10 has not presented evidence that WCD

11   Enterprises owns the Affiliate Websites, but that certain employees of WCD

12   Enterprises own the Affiliate Websites.  Even if Perfect 10 had raised a genuine issue

13   of material fact that WCD Enterprises was the alter ego of Internet Key, Perfect 10

14   has not provided evidence that there is a unity of interest between WCD Enterprises'

15   employees and the company WCD Enterprises.  Therefore, the Court finds this

16   argument without merit.

17        Perfect 10 also notes that sometimes, when an Affiliated Website is accessed

18   through SexKey, the words "sexkey.com" appear in the URL.  I Zadeh Decl., ¶ 65,

19   Exh. 51.  However, Perfect 10 has not provided the Court with any precedent that this

20   fact alone imparts direct infringer liability onto Internet Key without demonstrating

21   that Internet Key or its employees actually engaged in the infringing conduct.

22   Infringement occurs when a defendant violates one of the exclusive rights of the

23   copyright holder.  17 U.S.C. § 501(a).  A plaintiff can establish direct infringement

24   by demonstrating that a defendant used the copies in any of the ways described under

25   17 U.S.C. § 106, which include: (1) reproduction of the copyrighted work, (2)

26   preparation of derivative works based upon the copyrighted work, (3) distribution of

27   copies of the copyrighted work to the public by sale or other transfer of ownership,

28   or (4) display of the copyrighted work publicly.  17 U.S.C. § 106.  In order to prevail,

     defendants must "actively engage in" and "directly cause" one of the activities

     recognized in the Copyright Act.  See Perfect 10 v. Cybernet, 213 F. Supp. 2d 1146,

1  1168 (C.D. Cal. 2002) (*citing* Religious Tech. Ctr. v. Netcom On-Line
2  Communications Servs., Inc., 907 F. Supp. 1361 (N.D. Cal. 1995); Sega Enters., Ltd.
3  v. MAPHIA, 948 F. Supp. 923, 931 (N.D. Cal. 1996); Playboy Enters., Inc. v. Russ
4  Hardenburgh, Inc., 982 F. Supp. 503 (N.D. Ohio)).  Without evidence that Internet
5  Key actively engaged in or directly caused the alleged infringements, this argument
6  is equally unavailing.[11]

7

8                    b.    **Threshold Requirements Under § 512(i)**

9

10       Perfect 10 contends that Internet Key does not satisfy the threshold
11  requirements under § 512(i).  To reiterate, § 512(i) requires service providers to: (1)
12  adopt a policy that provides for the termination of service access for repeat copyright
13  infringers in appropriate circumstances; (2) implement that policy in a reasonable
14  manner; and (3) inform their clients of the policy.  See Ellison v. Robertson, 357 F.3d
15  1072, 1080 (9th Cir. 2004).  Perfect 10 does not dispute that Internet Key informs the
16  webmasters of its Affiliate Websites ("Affiliate Webmasters") of its policy.
17  Therefore, the two remaining issues before the Court are whether Internet Key has
18  adopted a policy that provides for the termination of repeat infringers in appropriate
19  circumstances and whether Internet Key implements that policy in a reasonable
20  manner.

21

22                    i.    *Policy for Termination of Repeat Infringers*

23

24       Internet Key has submitted its copyright infringement policy. Dykeman Decl.,
25  ¶ 14, Exh. A.  Perfect 10 argues that the policy fails on its face because "it is entirely

26  _____

27       [11] Perfect 10 also argues that Internet Key's website,
    sexkey.com, contains "infringements of celebrities."  I Zadeh
28  Decl., ¶ 13, Exh. 4.  However, the printouts of sexkey.com do not
    contain a single image of a celebrity but merely list their
    names.  Id.  The Court fails to see how a list of names can
    constitute a copyright violation pursuant to 17 U.S.C. § 501(a).
    Therefore, the Court finds this argument without merit.

                                     22

1   possible for a website owned by a given webmaster to receive copyright infringement

2   complaints week after week and nonetheless to remain part of SexKey, provided that

3   Internet Key does not receive complaints about . . . three different websites owned by

4   the same webmaster." II Opp. at 10:17-21.  Perfect 10 bases its argument on the

5   section of Internet Key's policy which refers to <u>webmasters</u>, which states:

7         **Banned Webmaster**

8         If a webmaster, identified by either the webmaster's name, vendor ID or

9         common ownership entity, has had three (3) websites which have been

10         denied participation in the SexKey program in accordance with this

11         policy, that webmaster will be denied participation in its program of any

12         webmaster or website in its discretion.

15   II Dykeman Decl., Exh. A at 11.  However, the policy also states that for <u>websites</u>,

16   if Internet Key receives DMCA-compliant notification, Internet Key will:

18      •     Act expeditiously to remove links to, or disable access, to the

19           allegedly infringing material

20      •     Take reasonable steps to promptly notify the accused subscriber

21           that the Company has removed or disabled access to the allegedly

22           infringing material.

23      •     Forward a copy of the written notification to the accused

24           subscriber, and inform the accused subscriber of counter

25           notification procedures.

26         . . .

27         **Repeat Offenders**

28         The participation of any website deemed to be a repeat offender will be

             terminated.

         **Banned Websites**

1    Pending receipt of a Counter Notification, participation of the website
2    subject to a Notification will be suspended.   A website will be
3    permanently prohibited from participating in the SexKey program upon
4    receipt by the Company of a second Notification.

SCANNED

5

6    Id. The policy provides that Internet Key will disable access to an Affiliate Website
7    after it receives a single notification of an infringement.   It also provides that it will
8    permanently ban a webmaster from Internet Key after it has received three
9    notifications regarding websites of any particular webmaster. Therefore, Perfect 10's
10   characterization of Internet Key's policy is incorrect.

11        Perfect 10 also argues that Internet Key has not adopted a reasonable
12   termination policy because there is a discrepancy in the evidence regarding the
13   identity of Internet Key's copyright agent.  Internet Key's termination policy, which
14   is located on its website, sexkey.com, states that Lawrence Walters is Internet Key's
15   copyright agent. I Dykeman Decl., Exh. A at 8-9.  During his deposition, Freeman
16   stated that Internet Key's copyright agent is the company CSC in Delaware. I Cooper
17   Decl., Exh. 1 at 121. Perfect 10 argues that Internet Key changed its copyright agent
18   and did not inform its subscribers of the change.   However, Perfect 10 has not
19   submitted any evidence that the copyright agent has changed or that notifications sent
20   to Walters were not responded to by Internet Key.  Internet Key may have more than
21   one copyright agent or the company CSC may have hired Walters to be the individual
22   copyright agent. Furthermore, every notification submitted as evidence in this case
23   was addressed to Freeman, not Walters or CSC.  Therefore, Internet Key likely has
24   more than one individual who responds to notifications of copyright infringement.

25        The Court finds, therefore, that Perfect 10 has failed to raise a genuine issue
26   of material fact that Internet Key has not adopted a policy that terminates repeat
27   infringers in appropriate circumstances.[12]

28

---

[12] Perfect 10 may argue that the fact that it takes three
notifications to terminate a webmaster is not sufficient under §
512(i).  However, § 512(i) specifically states that the internet

24

ii.    *Reasonable Policy Implementation*

Perfect 10 contends that Internet Key received substantially-compliant DMCA notifications and that Internet Key did not disable access to the infringing websites.[13] The parties dispute whether Perfect 10 provided Internet Key with DMCA-compliant notification of infringements. Since Internet Key's DMCA policy was not adopted until August 21, 2002, the Court will only look at notifications that were received by Internet Key after August 21, 2002.

Perfect 10 states that in its October 17, 2002 document production to Internet Key, Perfect 10 provided Internet Key with thousands of pages of printouts from SexKey affiliated websites which infringed either Perfect 10's or celebrities' rights. I Zadeh Decl., ¶ 24, Exh. 14 (representative examples of the print-outs). Some of the print-outs contain the names of Perfect 10 models in the URLs. Id. On March 13, 2002, Internet Key received a list of names of Perfect 10 models. I Freeman Decl., ¶ 35, Exh. D, at 29-34. Internet Key states that the October 17, 2002 document production contained 22,185 pages of documents. I Reply, at 7:3-11; see also I Zadeh Decl., ¶ 25, Exh. 15. Accompanying the production was a letter from Sean Morris of Arnold & Porter which states:

> With this letter I am sending you several boxes of documents that contain examples of the voluminous infringements on websites affiliated with Internet Key, Inc. ("SexKey") and other defendants in this case. These documents should assist you in assessing the scope of the

service provider must adopt a policy that terminates "repeat infringers." In order for an infringer to be a "repeat" infringer, he or she must infringe at least twice. Therefore, the Court finds that Internet Key's policy of terminating a webmaster after 3 notifications is reasonable.

[13] The Court notes that Internet Key is asserting the safe harbor provided under § 512(d) which adopts the notification and take down procedures identified in § 512(c)(3)(A). H.R. Rep. 105-551 (II), WL at *57.

infringements at issue in the above-referenced lawsuit and the potential damages SexKe

- The documents that accompany this letter represent examples of the infringements at issue in this case; these documents are not the only instances of wrongful conduct by the defendants.

- The documents that accompany this letter contain examples of both (i) infringements of Perfect 10 material; and (ii) infringements of third-party copyrights and rights of publicity. These documents were collected from so-called "celebrity" sites, which are easily locatable and are comprised of images that clearly infringe the copyrights and publicity rights of Perfect 10 and others.

- The infringements of Perfect 10 material are readily identifiable, especially in connection with the information contained in the complaint, and all come from celebrity sites.

- To further aid you in your assessment of the potential damages your company faces in this case, we have often included a full-sized printout of the image that constitutes infringement of Perfect 10's material . . .

I Zadeh Decl., Exh. 15. Perfect 10 has also submitted evidence that despite its notification of these infringements, the websites that contained the images were still active in October 2003. I Zadeh Decl., ¶ 46, Exh. 35.[14]  For example, in October 2002, Perfect 10 produced an image of Perfect 10 model Genevieve Maylam printed from the website cpics.adultmasters.net. I Zadeh Decl., ¶ 14, Exh. 14, at 40. In October 2003, the same image was still available on the same website. I Zadeh Decl., ¶ 46, Exh. 35, at 1041.

---

[14] Internet Key objects to portions of Exhibit 35 of Zadeh's declaration because some of the pages were not produced until after January 16, 2004, the deadline for the completion of Phase I discovery in this matter.  See II Kearney Decl., ¶¶ 11-12. This objection is overruled.

1    The issue before the Court, therefore, is whether the notice provided by Perfect
2    10 is substantially DMCA-compliant. If the notice is substantially DMCA-compliant,
3    then Perfect 10 has raised a genuine issue of material fact that Internet Key has not
4    reasonably implemented its termination policy.

5    First, Internet Key objects to this evidence because it argues that post-litigation
6    notices cannot be considered for purposes of the DMCA.  To support its argument,
7    Internet Key relies on Hendrickson v. Ebay, Inc., 165 F. Supp. 2d 1082, 1092 n.12 (C.
8    D. Cal. 2001).  However, in that case, the Court found that a discovery response by
9    the plaintiff in that case was not DMCA-compliant because it was not under oath, did
10   not attest to a good faith belief of the alleged infringements, and did not attest to the
11   accuracy of the allegations.  Id.  The Court did not state that the discovery response
12   was insufficient because it provided after the complaint was filed.  Id.  Therefore,
13   Internet Key's reading of the case is incorrect.

14   Under § 512(c)(3)(A)(ii), DMCA-compliant notification requires that the
15   accusing party identify the copyrighted work claimed to have been infringed, or, if
16   multiple copyrighted works at a single online site are covered by a single notification,
17   provide a representative list of such works at that site.  The notification requirements
18   also require that the notification contain a statement that the information in the
19   notification is accurate, under penalty of perjury, that the complaining party is
20   authorized to act on behalf of the owner of an exclusive right that is allegedly
21   infringed. § 512(c)(3)(A)(vi).  Perfect 10's letter states that the document production
22   contains infringements by Internet Key and the other defendants in this case of
23   Perfect 10's copyrights and the copyrights of third parties.  However, the letter
24   accompanying the document production does not identify which documents were
25   found on Internet Key's Affiliate Websites.  The letter also does not contain a
26   statement that the information in the notification is accurate.  The letter also does not
27   state that the author has a good faith belief that the information in the letter is
28   accurate nor is there a declaration under penalty of perjury.  The letter does state that
     the enlarged images are Perfect 10's images and include the specific URLs of the
     images. Therefore the letter identifies which images are infringements of Perfect 10's

copyrights; however, the letter does not identify Perfect 10's copyrights themselves, only the infringing images.[15] Under § 512(c)(3)(A)(ii) & (iii), the notification is required to identify both the copyrighted image and the infringing image. The purpose behind the notice requirement under the DMCA is to provide the internet service provider with adequate information to find and examine the allegedly infringing material expeditiously. Hendrickson v. Amazon.com, Inc., 298 F. Supp. 2d 914, 917 (C.D. Cal. 2003). Congress' intent was that both the copyright owner and the [internet service provider] cooperate with each other to detect and deal with copyright infringement that takes place on the Internet. Id. at 916-17.

The Court finds that Perfect 10's blanket statement that infringements of Perfect 10's copyrights are contained within 22,000 pages of documents without identification of Perfect 10's copyrights, without an identification of which documents were printed off of Internet Key's Affiliate Websites, and without a statement that the notification is accurate does not constitute notice that is substantially compliant with the requirements of § 512(c)(3)(A). Perfect 10 has not identified any other DMCA-compliant notices sent to Internet Key after Internet Key instituted its repeat infringer policy to trigger the implementation of Internet Key's policy. In the absence of evidence of DMCA-compliant notice, the Court finds that Perfect 10 has failed to raise a genuine issue of material fact that Internet Key failed to implement its termination policy in a reasonable manner. Therefore, there is no genuine issue of material fact that Internet Key has met the threshold requirements under § 512(i).

c.   **Safe Harbor Under §§ 512(d) and 512(a)**[16]

---

[15] The Court also notes that many Perfect 10 models have appeared in a variety of non-Perfect 10 venues such as Playboy, Penthouse, and other websites. III Spillane Reply Decl., Exh. 1 at 4.

[16] Internet Key did not raise the safe harbor under § 512(a) in its summary judgment motion. During oral argument, the Court

Section 512(d) states:

(d) Information location tools. A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider--

(1) (A) does not have actual knowledge that the material or activity is infringing;

(B) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(C) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(2) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(3) upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

invited Internet Key to submit supplemental briefing regarding § 512(a).  Internet Key filed a supplemental brief on May 20, 2004. Perfect 10 filed an opposition on May 27, 2004.

1  17 U.S.C. § 512(d).

2   Perfect 10 contends that Internet Key does not fall within the safe harbor

3  provided by § 512(d) because Internet Key (1) does not use an information location

4  tool, (2) has actual knowledge of infringements, (2) is aware of facts or circumstances

5  from which infringing activity is apparent.

6   Perfect 10 argues that Internet Key does not use an information location tool

7  as defined in § 512(d) because Internet Key is not like Yahoo! or Google which

8  provide links to millions of websites with whom it has no relationship.  Perfect 10

9  reasons that because Internet Key merely links to a relatively small universe of

10  websites with whom it has in place contractual relationships and established review

11  procedures, it is not entitled to protection under § 512(d).  Section 512(d) does not

12  state that the safe harbor is limited to internet service providers that provide links to

13  millions of websites.  Nor does § 512(d) state that the use of an information location

14  tool is limited to internet service providers that do not have contractual relationships

15  with their affiliate websites.  Therefore, these arguments are without merit.

16   Section 512(d) refers to service providers who refer or link users to an online

17  location containing infringing material or infringing activity, by using information

18  location tools, including a directory, index, reference, pointer, or hypertext link. §

19  512(d).  Internet Key's sexkey.com website provides that function and is therefore

20  covered by § 512(d).

21   Pursuant to § 512(d), the internet service provider must also (1) not be aware

22  of facts or circumstances from which infringing activity is apparent and (2)  not

23  receive a financial benefit directly attributable to the infringing activity, in a case in

24  which the service provider has the right and ability to control such activity.  Perfect

25  10 argues that Internet Key fails both of these requirements.  Perfect 10 argues that

26  Internet Key should have known there were copyright infringements on its clients'

27  websites because of the disclaimers on some of those websites.  The disclaimers

28  generally claim that the copyrighted images are in the public domain or that the

webmaster is posting the images for newsworthy purposes. I Zadeh Decl., Exh. 22.

These disclaimers are not sufficient to raise a red flag of copyright infringement.

1   Therefore, Perfect 10 has not demonstrated that Internet Key was aware of facts or
2   circumstances from which infringing was apparent.

3        The second requirement is that the internet service provider not receive a direct
4   financial benefit directly attributable to the infringing activity when it has the right
5   and ability to control such activity.  A right and ability to control infringing activity,
6   "as the concept is used in the DMCA, cannot simply mean the ability of a service
7   provider to remove or block access to materials posted on its website or stored in its
8   system."  Costar Group, Inc. v. Loopnet, Inc., 164 F. Supp. 2d 688, 704 (D. Md.
9   2001).  Internet Key's right and ability to control infringing activity is limited to
10  disconnecting the webmasters' access to Internet Key's service.  That type of control
11  is not sufficient, under the DMCA, to demonstrate a "right and ability to control" the
12  infringing activity.  As recognized in Perfect 10 v. Cybernet Ventures, Inc., 213 F.
13  Supp. 2d 1146, 1181 (C. D. Cal. 2002), "closing the safe harbor based on the mere
14  ability to exclude users from the system is inconsistent with the statutory scheme."
15  Id.  Since Internet Key does not have a right and ability to control the infringing
16  activity, the Court need not address whether Internet Key receives a direct financial
17  benefit from the infringing conduct.

18       Additionally, Internet Key serves another function.  Namely, when a user goes
19  to one of Internet Key's Affiliate Websites, the user is directed to the Internet Key
20  sign-up page for age verification purposes.  I Freeman Decl., ¶¶ 5-8.  This function
21  falls outside of the parameters of § 512(d) because Internet Key is not referring users
22  to other websites through a directory, index, reference, pointer, or hypertext link.
23  However, this function falls within the purview of § 512(a) which provides:
24

25       a) Transitory digital network communications. A service provider shall
26       not be liable for monetary relief, or, except as provided in subsection (j),
27       for injunctive or other equitable relief, for infringement of copyright by
28       reason of the provider's transmitting, routing, or providing connections
         for, material through a system or network controlled or operated by or
         for the service provider, or by reason of the intermediate and transient

1  storage of that material in the course of such transmitting, routing, or

2  providing connections, if--

3     (1) the transmission of the material was initiated by or at the direction

4  of a person other than the service provider;

5     (2) the transmission, routing, provision of connections, or storage is

6  carried out through an automatic technical process without selection of

7  the material by the service provider;

8     (3) the service provider does not select the recipients of the material

9  except as an automatic response to the request of another person;

10     (4) no copy of the material made by the service provider in the course

11  of such intermediate or transient storage is maintained on the system or

12  network in a manner ordinarily accessible to anyone other than

13  anticipated recipients, and no such copy is maintained on the system or

14  network in a manner ordinarily accessible to such anticipated recipients

15  for a longer period than is reasonably necessary for the transmission,

16  routing, or provision of connections; and

17     (5) the material is transmitted through the system or network without

18  modification of its content.

19

20  17 U.S.C. § 512(a). The section provides that "an internet service provider shall not

21  be liable . . . for infringement of copyright by reason of the provider's . . . providing

22  connections for material through a system or network controlled or operated by or for

23  the service provider, or . . ." § 512(a).   Internet Key provides a connection to the

24  material on its clients' websites through a system which it operates in order to provide

25  its clients with adult verification services.   Therefore, Internet Key's services fall

26  within the purview of both §§ 512(a) and 512(d).

27      The Court finds that there is no genuine issue of material fact that Internet Key

28  is entitled to the safe harbors pursuant to §§ 512(a) and 512(d).   Based on the

foregoing, Internet Key's motion for summary judgment for infringements after

August 21, 2002 based on the safe harbors under § 512(d) and § 512(a) is granted.

1   However, Internet Key's motion for summary judgment on Perfect 10's copyright

2   infringement claim for infringements before August 21, 2002 is denied.

3

4          3.      *CWIE's and CCBill's Motions for Summary Judgment on Perfect*

5                  *10's Copyright Claim*

6

7          Since the parties address many of the issues regarding CWIE and CCBill

8   together, the Court will address these Defendants together for issues where the

9   evidence overlaps.  CWIE and CCBill  assert that they are entitled to summary

10  judgment on Perfect 10's Claim 1 for copyright infringement because they fall within

11  the safe harbors provided by the DMCA under § 512.

12

13         a.      **Threshold Requirements Under § 512(i)**

14

15         Perfect 10 argues that CWIE and CCBill do not reasonably implement their

16  repeat infringer policies under § 512(i).[17]  Perfect 10 cites to CWIE and CCBill's

17  DMCA notice spreadsheet and argues that many of the webmaster names are not

18  included in the spreadsheet. III Fisher Decl., Exh. C. Perfect 10 contends that CWIE

19  and CCBill do not track the actual webmasters of the websites for which they receive

20  notifications.  The Court has reviewed the spreadsheet and finds that a few of the

21  webmaster names are missing from notifications that were either resolved by the

22  copyright owner and the webmaster or were not DMCA-compliant.  The Court finds

23  that the fact that a few of the webmaster names are missing from the spreadsheet in

24  instances where the notice was deficient or the issue was resolved is not sufficient to

25

_____

26      [17] Perfect 10 does not assert other violations of § 512(i)

27  against these Defendants.

28      CWIE and CCBill adopted their policies in 1999.  Since
    Perfect 10 does not allege any infringements that pre-date 1999,
    the Court finds that CWIE's and CCBill's repeat infringer
    policies were in place during the entire period of alleged
    infringements.

1  raise a genuine issue of material fact that CWIE and CCBill do not reasonably

2  implement their repeat infringer policies.

3       Perfect 10 has submitted notifications of infringement of Perfect 10's

4  copyrights that it sent to CCBill and CWIE which it claims are DMCA-compliant.

5  The first is a letter from Perfect 10's counsel to Fisher dated August 10, 2001. III

6  Zadeh Decl., Exh. 14. The letter identifies several websites which Perfect 10 claims

7  contain infringements of Perfect 10's copyrights. Id. at 144. The letter only identifies

8  the websites that contain the allegedly infringing material, it does not identify the

9  URLs of the images nor does it identify which of Perfect 10's images are being

10 infringed.  Under § 512(c)(3)(A)(ii) and (iii), DMCA-compliant notification must

11 identify the copyrighted work claimed to have been infringed and the material that is

12 claimed to be infringing with "information reasonably sufficient to permit the service

13 provider to locate the material." This notification does not fulfill either of those

14 requirements because it does not identify Perfect 10's images or give CCBill and

15 CWIE sufficient information to locate the infringing material.  These websites may

16 contain more than one hundred images at different URLs; it is Perfect 10's

17 responsibility, under the DMCA, to provide these Defendants with enough

18 information to allow them to locate the infringing material.  The Court finds that the

19 August 10, 2001 letter does not substantially comply with the requirements of the

20 DMCA and therefore, does not constitute proper notification under § 512(c)(3)(A).[18]

21

22       The next notification is an email Norman Zadeh sent to Fisher on February 6,

23 2002 which identifies websites which contain images of celebrities but does not

24 identify websites which contain Perfect 10's copyrighted images. III Zadeh Decl.,

25 Exh. 17.  Therefore, this email does not comply.

26       The next notification is a letter from Perfect 10's counsel dated March 12, 2002

27 which suffers from the same deficiency as Exhibit 14 above. III Zadeh Decl., Exh.

28 18. It does not identify the allegedly infringing material with enough specificity to

---

[18] Perfect 10 also cites to Exhibit 16 of the Zadeh
Declaration but it has failed to include it in the declaration.

1    allow CCBill and CWIE to locate the information. Exhibit 20 (email dated March 28,

2    2002) also suffers from the same lack of specificity.

3         Perfect 10 also identifies Exhibit I to the Complaint as notification of violations

4    of Perfect 10's copyrights. Exhibit I to the Complaint lists websites that Perfect 10

5    contends contain Perfect 10 infringements. See Compl., Exh. I. The Court finds that

6    Exhibit I is not DMCA-compliant because it does not give the Defendants sufficient

7    notification to allow them to locate the allegedly infringing material.[19] Perfect 10 has

8    also submitted its RICO Case Statement which Perfect 10 produced to Defendants on

9    December 19, 2002. III Zadeh Decl., Exh. 26 at 317-321. The RICO Case Statement

10   does not identify the URLs of the allegedly infringing material or identify Perfect 10's

11   copyrighted images. Id. Therefore, this notification does not substantially comply

12   with the requirements of § 512(c)(3)(A).

13        Perfect 10 also identifies a July 14, 2003 email sent to Fisher which had

14   attached to it an Excel spreadsheet which identifies websites and the names of Perfect

15   10 models who appear on those websites. III Zadeh Decl., Exh. 29. Perfect 10 argues

16   that this spreadsheet contains the URLs of the infringing images, however, the Court

17   is unable to locate a single URL that is the URL for the actual infringing image. Id.

18   Most of the URLs provided refer to the "members only" area of the website, not the

19   URL of the specific image within the "members only" area of the website. Id. Again,

20   this is not the type of notification contemplated by § 512(c)(3)(A).[20]

21

22   ─────────────

     [19] Perfect 10 has also submitted a letter dated October 16,
23   2002 that is nearly identical to the letter sent to Internet Key
     that accompanied the same 22,000 page document production to all
24   of the Defendants.  III Zadeh Decl., Exh. 25.  See Section
     IV.2.b.ii, supra, for a discussion of this letter.
25

     [20] During his deposition, Fisher was asked whether he could
26   act on the information that was provided in the spreadsheet and
     responded "yes."  III Cooper Decl., Exh. 2 at 30:16-21.  Perfect
27   10 argues that Fisher admitted that he had received DMCA-
     compliant notification based on this deposition testimony.
28   However, Fisher did not state that the notification was DMCA-
     compliant or that the information allowed CCBill and CWIE to
     expeditiously locate the infringing material.  Therefore, the
     Court finds Perfect 10's argument without merit.

1   Perfect 10 has also submitted several emails from Perfect 10 to CWIE
2   regarding password hacking websites that provide passwords to Perfect 10's website,
3   perfect10.com, hosted by CWIE.  III Zadeh Decl., Exhs. 72, 75, 76, 77 & 78.
4   Password hacking websites are free websites which post passwords to subscription
5   websites. Perfect 10 argues that it provided DMCA-compliant notification regarding
6   these websites and CWIE did not discontinue its hosting of these websites. However,
7   Perfect 10 has not submitted any evidence that the use of the passwords on these
8   websites actually resulted in the infringement of Perfect 10's copyrights. Perfect 10
9   has submitted a print-out of its server log and Zadeh's declaration which states that
10  there were attempted accesses from crazypasses.com on September 18, 2002.  III
11  Zadeh Decl., ¶ 101, Exh. 88. However, attempted access to Perfect 10's website is not
12  sufficient to demonstrate copyright infringement which requires that the images on
13  Perfect 10's website were actually copied onto the user's computer when the user
14  accessed the website.  See 17 U.S.C. § 106.  Therefore, Perfect 10's has not
15  demonstrated that CWIE's hosting of these password hacking websites resulted in
16  copyright infringement.

17      Perfect 10 has not provided the Court with any substantially compliant DMCA-
18  notifications that were sent to CCBill and CWIE.  Perfect 10 may not make an end-
19  run around the requirements of the DMCA by providing the Defendants with
20  notification that does not substantially comply with the requirements of §
21  512(c)(3)(A).  The Court finds that Perfect 10 has not raised a genuine issue of
22  material fact that CCBill and CWIE did not reasonably implement their repeat
23  infringer policies.[21]

24

25          b.      **Safe Harbor Under § 512(a) and CCBill**

26

27  ───────────────

       [21] Perfect 10 has also submitted notifications by third-
28  party copyright holders.  However, as the Court has already
    stated, *supra*, notifications of third-party copyright
    infringements are not relevant to Perfect 10's claim for
    copyright infringement and the Defendants DMCA defense to that
    claim.

                                36

1    CCBill argues that it falls within the safe harbor in § 512(a) which provides:

2

3    a) Transitory digital network communications. A service provider shall

4    not be liable for monetary relief, or, except as provided in subsection (j),

5    for injunctive or other equitable relief, for infringement of copyright by

6    reason of the provider's transmitting, routing, or providing connections

7    for, material through a system or network controlled or operated by or

8    for the service provider, or by reason of the intermediate and transient

9    storage of that material in the course of such transmitting, routing, or

10   providing connections, if--

11     (1) the transmission of the material was initiated by or at the direction

12   of a person other than the service provider;

13     (2) the transmission, routing, provision of connections, or storage is

14   carried out through an automatic technical process without selection of

15   the material by the service provider;

16     (3) the service provider does not select the recipients of the material

17   except as an automatic response to the request of another person;

18     (4) no copy of the material made by the service provider in the course

19   of such intermediate or transient storage is maintained on the system or

20   network in a manner ordinarily accessible to anyone other than

21   anticipated recipients, and no such copy is maintained on the system or

22   network in a manner ordinarily accessible to such anticipated recipients

23   for a longer period than is reasonably necessary for the transmission,

24   routing, or provision of connections; and

25     (5) the material is transmitted through the system or network without

26   modification of its content.

27

28   17 U.S.C. § 512(a). Perfect 10 argues that CCBill does not fall within the safe harbor
provided in § 512(a) because it does not transmit the infringing material at issue in
this case. Perfect 10 argues that § 512(a) only provides protection for internet service

1   providers that transmit the allegedly infringing material, not other material, such as
2   credit card information. Perfect 10 relies on In re Aimster Litigation, 252 F. Supp.
3   2d 634, 659-660 (N.D. Ill. 2002), to support its argument.

4       Perfect 10 relies on the section of § 512(a) that refers to the transmission of the
5   material; it has failed, however, to address the section of § 512(a) which refers to the
6   provision of a connection to the material. The section provides that "an internet
7   service provider shall not be liable . . . for infringement of copyright by reason of the
8   provider's . . . providing connections for material through a system or network
9   controlled or operated by or for the service provider, or . . ." § 512(a). CCBill
10  provides a connection to the material on its clients' websites through a system which
11  it operates in order to provide its clients with billing services. Perfect 10 argues that
12  CCBill "blocks" access to these websites and does not provide a connection to the
13  websites because it prevents consumers from accessing the websites if they have not
14  first paid a fee to CCBill. CCBill does not block access to these websites; the
15  webmasters of the websites block consumers from accessing the websites unless those
16  consumers pay for access through CCBill. Therefore, the Court finds this argument
17  without merit.

18      Perfect 10's reliance on In re Aimster Litigation is misplaced because that case
19  dealt with the transmission of material, not the provision of a connection to the
20  material. See In re Aimster Litigation, 252 F. Supp. 2d 634, 659-660 (N.D. Ill. 2002).
21  The Court finds that there is no genuine issue of material fact that CCBill is entitled
22  to protection under the safe harbor provided by § 512(a).

23      Therefore, the Court grants CCBill's motion for summary judgment and finds
24  that CCBill is protected by the safe harbor under § 512(a).

25                    c.    **Safe Harbor Under § 512(c) and CWIE**
26

27      CWIE argues that it is entitled to protection under the safe harbor provided in
28  § 512(c)(1). Sections 512(c)(1) states:

        (1) In general. A service provider shall not be liable for monetary relief,

or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider--

(A) (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c).[22] Perfect 10 argues that CWIE does not fulfill the requirements of § 512(c)(1) because (1) it has actual knowledge of Perfect 10's infringements on its clients' websites; (2) is aware of facts or circumstances from which infringing activity is apparent; (3) it has failed to expeditiously remove or disable access to infringing material of which it had knowledge; and (4) it receives a financial benefit directly attributable to the infringing activity and has the right and ability to control such activity.

---

[22] Section 512(c)(2) also requires that the internet service provider have a designated copyright agent to receive notification under § 512(c)(3). Perfect 10 does not contend that CWIE does not have such an agent.

39

1                              i.    Knowledge

2

3          Perfect 10 argues that CWIE cannot assert the safe harbor under § 512(c)(1)

4   because it had knowledge of copyright infringements on its clients' websites. Perfect

5   10 relies on the notifications Perfect 10 sent to CWIE to support its argument.

6   However, the Court has already found that those notifications did not comply with the

7   requirements of § 512(c)(3)(A).  Therefore, Perfect 10 cannot argue that CWIE had

8   knowledge of infringements based on these notices.  Hendrickson v. eBay, 165 F.

9   Supp. 2d 1082, 1093 (C.D. Cal. 2001) ("the court does not consider [those] defective

10  notices when evaluating the actual or constructive knowledge prong of the safe

11  harbor test.").

12         Perfect 10 also argues that CWIE was aware of facts or circumstances from

13  which infringing activity was apparent.  In including § 512(c)(1)(A)(ii), Congress

14  contemplated obvious "pirate sites" where "sound recordings, software, movies, or

15  books were available for unauthorized downloading, public performance"–in other

16  words, "red flag" websites from which infringements would be apparent based on a

17  cursory review of the website.  H.R. Rep. 105-551 (II) at 57.  Congress described

18  such websites as obviously infringing because they typically use words such as

19  "pirate" or "bootleg" or slang terms in their URL, and header information to make

20  their illegal purpose obvious, in the first place, to the pirate directories as well as

21  other Internet users.  Id. at 58.  "Because the infringing nature of such sites would be

22  apparent from even a brief and casual viewing, safe harbor status for a provider that

23  views such a site and then establishes a link to it would not be appropriate."  Id.

24         Perfect 10 argues that CWIE hosted websites that obviously contained images

25  of celebrities to which the webmasters did not own the copyrights.  III Zadeh Decl.,

26  ¶ 76, Exh. 61.  Perfect 10 has submitted print-outs from the websites that advertise

27  images of celebrities.  See id. The websites advertise images of celebrities; however,

28  the Court does not find that the websites contain obvious infringements because the

websites do not advertise themselves as pirate websites.  See id.  Furthermore, the

Court finds that Perfect 10's argument that most celebrity websites contain stolen

material and therefore CWIE should have known there were infringements on these websites without merit. As noted by Congress, "a directory provider would not be similarly aware because it saw one or more well known photographs of a celebrity at a site devoted to that person. The provider could not be expected, during the course of its brief cataloguing visit, to determine whether the photograph was still protected by copyright or was in the public domain; if the photograph was still protected by copyright, whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine." The Court finds that the advertisement of celebrity photos is not sufficient to raise a "red flag" that these websites were obviously pirate websites with infringing content.[23]  Based on the foregoing, the Court finds that Perfect 10 has not raised a genuine issue of material fact that CWIE had actual or constructive knowledge of infringements on its clients' websites. The Court also finds that  there is no genuine issue of material fact that CWIE failed to expeditiously remove or disable access to infringing material of which it had knowledge.

ii.   Financial Benefit and Right and Ability to Control

Perfect 10 argues that CWIE cannot assert safe harbor protection because it receives a direct financial benefit from the infringing activity on its clients' websites and has the right and ability to control the infringing activity on its clients' websites. 17 U.S.C. § 512(c)(B). A right and ability to control infringing activity, "as the

---

[23] During oral argument, Perfect 10 also cited to several disclaimers on websites affiliated with CCBill to support its argument that CWIE had "red flag" knowledge of copyright infringement.  III Zadeh Decl., Exhs. 63 & 64.  However, Perfect 10 has not provided any disclaimers on websites associated with CWIE.  Therefore, this evidence is irrelevant to the Court's analysis of CWIE's knowledge.

1   concept is used in the DMCA, cannot simply mean the ability of a service provider

2   to remove or block access to materials posted on its website or stored in its system.

3   Costar Group, Inc. v. Loopnet, Inc., 164 F. Supp. 2d 688, 704 (D. Md. 2001).

4   CWIE's right and ability to control infringing activity is limited to disconnecting the

5   webmasters' access to CWIE's service. That type of control is not sufficient, under

6   the DMCA, to demonstrate a "right and ability to control" the infringing activity. As

7   recognized in Perfect 10 v. Cybernet Ventures, Inc., 213 F. Supp. 2d 1146, 1181 (C.

8   D. Cal. 2002), "closing the safe harbor based on the mere ability to exclude users

9   from the system is inconsistent with the statutory scheme." Id. Perfect 10 argues that

10  the fact that CWIE reviews its websites for illegal material, such as child pornography

11  and obscenity, takes CWIE out of the safe harbor provision because CWIE has the

12  right and ability to do more than merely exclude users from its system. In Cybernet,

13  the Court found that the fact that the defendant "prescreens sites, gives them

14  extensive advice, [and] prohibits the proliferation of identical sites" was sufficient

15  additional control to fall outside of the safe harbor. However, the Court did not find

16  that merely prescreening sites was enough. In this case, the Court finds that merely

17  because CWIE reviews its sites to look for blatantly illegal and criminal conduct is

18  not sufficient to close the safe harbor to CWIE. Such a reading of the statute would

19  not be in line with the purpose of the DMCA to encourage internet service providers

20  to work with copyright owners to locate and stop infringing conduct.

21       Since the Court finds that CWIE does not have a right and ability to control the

22  infringing activity on its clients' websites, it need not reach the issue of whether

23  CWIE receives a direct financial benefit from the allegedly infringing conduct.

24       Based on the foregoing, the Court finds that Perfect 10 has not raised a genuine

25  issue of material fact that CWIE does not fall within the safe harbor under § 512(c).

26  Therefore, the Court grants CWIE's motion for summary judgment and finds that

27  CWIE is entitled to the protection provided in § 512(c).

28

                    4.    *Perfect 10's RICO Claims*

                                42

1   Defendants argue that since they fall within the safe harbors provided by § 512
2   which limit liability for copyright infringement, their liability for Perfect 10's RICO
3   violations should similarly be limited.[24]  Perfect 10 argues that the Defendants cannot
4   assert the safe harbors under § 512 against its RICO claims because its RICO claims
5   are predicated on (1) infringements of Perfect 10's copyrights and (2) infringements
6   of third-party copyrights.  The Defendants do not dispute that Perfect 10 has standing
7   to maintain its RICO claims based on infringements of Perfect 10's copyrights.
8   However, since the Court has already found that Defendants IBill, CCBill, CWIE, and
9   Internet Key[25] are entitled to safe harbor protections under § 512 against Perfect 10's
10  copyright claims, those safe harbors also provide these Defendants with protection
11  against Perfect 10's RICO claims based on the infringements of Perfect 10's
12  copyrights.  The issue before the Court, therefore, is whether Perfect 10 has standing
13  to allege RICO claims based on predicate acts of infringements of third-party
14  copyrights.

15      The Ninth Circuit addressed the issue of statutory standing in Mendoza v.
16  Zirkle Fruit Co., 301 F.3d 1163, 1168-69 (9th Cir. 2002).  The Ninth Circuit first
17  examined the RICO statute which states that "any person injured in his business or
18  property by reason of a violation of section 1962 of this chapter may sue therefor in
19  any appropriate United States district court for civil damages."  Id. at 1168.  The
20  Ninth Circuit identified the key issue in its analysis as determining whether the injury
21  suffered by the plaintiffs "was by reason of" the defendants' conduct.  Id.  The Ninth
22  Circuit referred to several cases, decided by the U.S. Supreme Court in the context
23  of antitrust and RICO, which hold that "potential plaintiffs who have suffered a
24  'passed-on' injury–that is, injury derived from a third party's direct injury–lack
25  statutory standing."  Id.  In the Ninth Circuit, there are three factors that courts

26

27
_____

[24] Perfect 10's RICO claims are based solely on predicate
28  acts of criminal copyright infringement.

[25] Internet Key is entitled to the safe harbor provisions of
§ 512 against Perfect 10's RICO claims for copyright
infringements after August 21, 2002.

1 consider in determining whether an injury is too remote to allow the plaintiff statutory
2 standing:

4     (1) whether there are more direct victims of the alleged wrongful
5     conduct who can be counted on to vindicate the law as private attorneys
6     general; (2) whether it will be difficult to ascertain the amount of the
7     plaintiff's damages attributable to defendant's wrongful conduct; and (3)
8     whether the courts will have to adopt complicated rules apportioning
9     damages to obviate the risk of multiple recoveries.

11 Id. at 1169. Perfect 10 is asserting that it has suffered an injury based on the
12 Defendants' alleged infringements of third-party copyrights. Under the first factor,
13 it is clear that the owners of the copyrights themselves are the more direct victims of
14 the alleged wrongful conduct. Furthermore, Perfect 10 has not presented any
15 evidence that those direct victims cannot assert their own rights on their own behalf.
16 Under the second factor, the Court finds that it would be difficult to ascertain the
17 amount of damages to Perfect 10 based on the Defendants' alleged infringements of
18 third parties' copyrights. Perfect 10's injury is stated as a competitive
19 injury–however, proving that violations of another party's copyrights have caused a
20 competitive injury is too speculative to allow for the ascertainment of a damages
21 amount. And finally, under the third consideration, it is also clear that the copyright
22 holders themselves are entitled to damages if they demonstrate that the Defendants
23 have violated their copyrights. Therefore, the Court would have to apportion
24 damages as to prevent double recovery by the copyright owners and Perfect 10.

25     During oral argument, Perfect 10 argued that the Second Circuit's opinion in
26 Commercial Cleaning Services, LLC v. Colin Service Systems, Inc., 271 F.3d 374 (2d
27 Cir. 2001), supports its argument that it may assert the violations of third parties'
28 copyrights as the predicate acts of its RICO claim. In Commercial Cleaning, the
Second Circuit found that the competitor of a cleaning agency that was hiring illegal
immigrants to underbid the competitor had standing to bring a RICO claim based on

1   its competitive injury. Id. at 385. However, the Second Circuit also found that there
2   were not more direct victims of the illegal activity who had standing to sue. "There
3   is no class of potential plaintiffs who have been more directly injured by the alleged
4   RICO conspiracy than the defendant's business competitors . . ." Id. In the case
5   before this Court, the third-party copyright owners are the direct victims of the
6   alleged infringement and may bring suit on their own behalf. Therefore, this case is
7   distinguishable from the case at bar and does not support Perfect 10's argument that
8   it has standing to assert the violations of third-parties' copyrights.

9       The Court finds that in consideration of these factors, Perfect 10 has not
10  demonstrated that it has statutory standing to assert the violations of third parties'
11  copyrights as the predicate acts of its RICO claim.

12      Therefore, IBill, CCBill, CWIE and Internet Key (limited to post-August 21,
13  2002 infringements) are entitled to the safe harbor provisions of § 512 against Perfect
14  10's RICO claims.

15

16      B.    Communications Decency Act

17

18      The CDA provides immunity to providers and users of interactive computer
19  services. It states that "[n]o provider or user of interactive computer service shall be
20  treated as a publisher or speaker of any information provided by another content
21  provider." 47 U.S.C. § 230(c)(1). In addition, the CDA states that "[n]o cause of
22  action may be brought and no liability may be imposed under any State or local law
23  that is inconsistent with this section." 47 U.S.C. § 230(e)(3). Congress placed two
24  limitations on the grant of this broad immunity. The first is § 230(e)(2) which states
25  that the CDA shall not be construed to limit or expand any law pertaining to
26  intellectual property.    47 U.S.C. § 230(e)(2). The second is that immunity is not
27  available for violations of federal criminal statutes. 47 U.S.C. § 230(e)(1).

28      Defendants assert that they are entitled to summary judgment on Perfect 10's
    state law claims because they are immune from prosecution for these claims under the
    CDA.

1    All of the Defendants seek summary judgment on the bases that they are

2    immune from Perfect 10's Fifth Cause of Action for violation of rights of publicity,

3    Sixth Cause of Action for unfair competition under the California Business &

4    Professions Code §§ 17200, and Seventh Cause of Action for false and misleading

5    advertising pursuant to California Business & Professions Code § 17500 and

6    California common law.[26] Defendants IBill, CWIE, and CCBill also assert that they

7    are immune from prosecution for Perfect 10's Fourth Cause of Action for wrongful

8    use of a registered trademark under California law.

9    Perfect 10 opposes summary judgment on the following grounds: 1) the CDA

10    does not apply to intellectual property claims, 2) the Defendants' knowledge of

11    infringements negates the CDA's protection, 3) the CDA does not protect the

12    Defendants' alleged roles as distributors, and 4) the Defendants' roles in the

13    promotion of obscenity and child pornography bar them from taking advantage of the

14    CDA. Perfect 10 does not argue that the Defendants do not fulfill any of the other

15    requirements of the CDA; for example, there is no genuine issue of material fact that

16    all of the Defendants are providers and users of interactive computer services.

17    Therefore, the Court does not address these additional requirements.

18    Since these arguments apply equally to all of the Defendants because they are

19    legal arguments regarding the scope of the CDA and are not fact dependent, the Court

20    addresses the Defendants collectively.

21

22    1.   *Intellectual Property*

23

24    The CDA does not "limit or expand any law pertaining to intellectual

25    property." 47 U.S.C. § 230(e)(2). Perfect 10 asserts that all four of its state law

26    claims are based on intellectual property law and thus the CDA does not provide

27    ————————————

28    [26] Claim 6 also contains allegations of unfair competition under the Lanham Act. The Defendants have not asserted that they are immune from prosecution for this claim, therefore, the Court limits its discussion of Claim 6 to the alleged violations of California Business & Professions Code §§ 17200.

1   immunity for them.  The Defendants argue that these claims are not intellectual

2   property claims but state law tort claims. The Court will address each claim in turn.

3

4           a.    **Wrongful Use of a Mark**

5

6       Perfect 10's Fourth Cause of Action alleges wrongful use of a registered mark

7   in violation of Cal. Bus. & Prof. Code § 14335.  It is generally understood that

8   trademarks are intellectual property. See, e.g., Allison v. Vintage Sports Plaques, 136

9   F.3d 1443, 1448 (11th Cir. 1998) (holding that the three principal forms of

10  intellectual property are copyright, patent, and trademark); Shakespeare Co. v. Silstar

11  Corp. of Am., Inc., 9 F.3d 1091, 1103-04 (4th Cir. 1993) (listing the areas of

12  intellectual property as trademark, copyright, and patents); White v. Samsung Elecs.

13  Am., Inc., 989 F.2d 1512, 1516 (9th Cir. 1993) (discussing the different balances of

14  public interest in patents, copyright, and trademark).  Several cases have held that

15  immunity under the CDA does not apply to federal trademark claims. See Gucci Am.,

16  Inc. v. Hall & Assocs., 135 F. Supp. 2d 409, 413 (S.D.N.Y. 2001) (holding that to

17  immunize defendant from trademark claims would limit laws pertaining to intellectual

18  property); Ford Motor Co. v. Greatdomains.com, Inc., No. 00-CV-71544-DT, 2001

19  WL 1176319, at *1 (E.D. Mich. Sept. 25, 2001) (holding that if defendant violated

20  federal trademark laws the CDA would not provide immunity).  Consequently,

21  California's wrongful use of registered mark law also pertains to intellectual property

22  because the law provides the same type of relief as the federal trademark laws under

23  the Lanham Act, namely, protection for trademarks.  Since the CDA does not extend

24  immunity for Perfect 10's Claim 4 for wrongful use of a registered mark because such

25  immunity would limit laws pertaining to intellectual property, Defendants IBill's,

26  CCBill's, and CWIE's motions for summary judgment on this claim are denied.

27

28          b.    **Unfair Competition under California Business &**
                  **Professions Code §§ 17200**

1    Perfect 10 also points out that its Claim 6 for unfair competition arises from
2  Defendants' trademark infringement, a violation of law pertaining to intellectual
3  property.   As discussed above, the CDA does not limit any law pertaining to
4  intellectual property. See 47 U.S.C. § 230(e)(2). The issue here is whether the UCL
5  based on alleged infringement of trademarks is a "law pertaining to intellectual
6  property."   The unfair competition law (the "UCL") itself makes no mention of
7  intellectual property. See Cal. Bus. & Prof. Code § 17200 ("As used in this chapter,
8  unfair competition shall mean and include any unlawful, unfair or fraudulent business
9  act or practice and unfair, deceptive, untrue or misleading advertising and any act
10  prohibited by Chapter 1 ... of the Business and Professions Code").   While
11  intellectual property law generally seeks to encourage creativity and invention, the
12  purpose of the UCL is to preserve fair business competition.   See Cel-Tech
13  Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180, 83 Cal.
14  Rptr. 2d 548, 560-61 (1999).
15    Infringing on a trademark is an unlawful business practice which may establish
16  a violation of the UCL. See Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175,
17  1178 (9th Cir. 1988) (holding that likelihood of confusion was the crucial issue for
18  both trademark infringement and unfair competition).   Perfect 10 argues that this
19  makes the unfair competition statute a law pertaining to intellectual property.
20  However, a violation of the UCL includes any business practice which may be
21  unlawful, unfair, or fraudulent. People v. McKale, 25 Cal. 3d 626, 631-32, 159 Cal.
22  Rptr. 811, 813-14 (1979); Wilkinson v. Time Mirror Corp., 215 Cal. App. 3d 1034,
23  1052, 264 Cal. Rptr. 194, 206 (Cal. Ct. App. 1989).  Accordingly, unfair competition
24  encompasses anything that can properly called a business practice which at the same
25  time is forbidden by law. Wilkinson, 215 Cal. App.3d at 1052, 264 Cal. Rptr. at 206.
26  The fact that violations of intellectual property laws may create the underlying unfair
27  or unlawful act for the UCL does not transform the statute into a law pertaining to
28  intellectual property.  Therefore, the immunity provided by the CDA does apply to
Perfect 10's Claim 6 for unfair competition under the UCL.

c.      **Right of Publicity**

The parties also dispute whether Perfect 10's Claim 5 for violations of the right of publicity pursuant to California Civil Code section 3344 and common law rights of publicity bring § 230(e)(2) into play.  The California Supreme Court has held that the right of publicity is a form of intellectual property.  See Comedy III Productions, Inc. v. Gary Saderup, Inc., 25 Cal. 4th 387, 399, 106 Cal. Reptr. 2d 126, 135 (2001). This conclusion is buttressed by other courts and commentators.  See, e.g., ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 928 (6th Cir. 2003) ("The right of publicity is an intellectual property right of recent origin which has been defined as the inherent right of every human being to control the commercial use of his or her identity."); 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 28.1 (4th ed. 2003) ("The right of publicity is property, and is properly categorized as a form of intellectual property.").    In Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1125 (9th Cir. 2003), the Ninth Circuit dismissed a right of publicity claim based on immunity granted under § 230(c)(1) of the CDA without any discussion of § 230(e)(2).  However, since neither the Ninth Circuit nor the trial court, 207 F. Supp. 2d 1055 (C.D. Cal. 2002), performed any analysis as to whether the exclusion in § 230(e)(2) applied, it is unclear whether this issue was properly before the Ninth Circuit in that case.  Since the weight of authority supports a finding that the right of publicity is an intellectual property right, the Court finds that claims under California's right of publicity statute and the common law are excluded from immunity under the CDA.

Therefore, the Court denies the Defendants' motions for summary judgment on Perfect 10's Claim 5 for violations of the right of publicity.

d.      **False Advertising Pursuant to California Business &**
**Professions Code §§ 17500 and the Common Law**

Finally, Perfect 10 contends that Claim 7 for false advertising pursuant to

California Business & Professions Code § 17500 and California common law is an intellectual property claim and, as such, is excluded under § 230(e)(2) of the CDA. Perfect 10 argues that since it is alleging that the Defendants' affiliate webmasters have engaged in false advertising by misrepresenting the nature and source of the content on their websites and that such conduct constitutes violations of Perfect 10's intellectual property rights, the false advertising claims are also excluded from the immunities provided by § 230(e)(2) of the CDA.   Perfect 10 does not cite to any authority to support its argument.  Neither § 17500 nor California common law false advertising refer to intellectual property rights.  See Cal. Bus. & Prof. Code § 17500;[27] Chronicle Pub. Co. v. Chronicle Publications, Inc., 733 F. Supp. 1371, 1380-

---

[27]   Section 17500 provides:

It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($ 2,500), or by both that imprisonment and fine.

81 (N.D. Cal. 1989) (claim under § 17500 and California common law false advertising require analysis of the same factors). Since false advertising under § 17500 and California common law does not pertain to intellectual property rights, the Court finds that the immunity provided under the CDA for Perfect 10's false advertising claim is not excluded under § 230(e)(2).

### 2. *Knowledge*

Perfect 10 argues that the CDA does not apply to its claims against the Defendants because the Defendants knew or should have known of the infringements on their affiliate websites. Accordingly, Perfect 10 argues that under Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003), the Defendants are not entitled to CDA immunity. Batzel, however, creates no such knowledge exception. Batzel stands for the unrelated proposition that internet service providers are not provided immunity if they know or should have known that the content was not meant for publication.

In Batzel, one defendant, Cremers, published listserve newsletters about museum security and stolen art based partly on e-mails from third parties. See id. at 1021. Defendant Smith sent Cremers an e-mail alleging that Batzel was in possession of stolen art. See id. Cremers published Smith's e-mail on his listserve newsletter. See id. at 1022. In considering whether Cremers was protected by the CDA, the Court looked at whether Smith had "provided" Cremers with the e-mail as required by section 230(c)(1). "If the defamatory information is not '*provided* by another information content provider,' then § 230(c) does not confer immunity on the publisher of the information." Id. at 1032 (emphasis in original). The Court found that it was not the intent of Congress to create immunity for the intentional posting of material never meant to be put on the Internet. See id. at 1033. It was in this context that the Court stated that immunity only applies when the "third person or entity that created or developed the information in question furnished it to the

provider or user under circumstances in which a reasonable person in the position of the service provider or user would conclude that the information was provided for publication on the Internet or other 'interactive computer service.'" Id. at 1034. In other words, in Batzel, the focus on the applicability of immunity under § 230(c)(1) is on the service provider's or user's reasonable perception that the information was provided for publication on an interactive computer service. See id. at 1032-34.

In this case, it is clear that any content on the Defendants' affiliate websites was provided for publication on the Internet. Perfect 10 contends that the focus should be on whether Perfect 10 provided the material for publication by the affiliate webmasters. Based on this argument, an interactive computer service would be required to determine whether the information content provider intended the content to be published in a particular forum. This was not the focus of the Ninth Circuit in Batzel. Rather the Court withdrew protection only for those internet service providers who would publish on the Internet *private* communications the provider knew or had reason to know were never intended to be published at all. All of the images owned by Perfect 10 were intended to be published and they are indeed published on Perfect 10's own website. See, e.g., I Zadeh Decl. at ¶ 17. None of the evidence provided by Perfect 10 creates a genuine issue of material fact as to whether the images on the Defendants' affiliate websites were intended to be private and unpublished. Therefore Batzel is inapposite and does not preclude the application of CDA immunities to Perfect 10's Claim 6 for unfair competition under the UCL and Claim 7 for false advertising.

### 3. *Distributor*

Perfect 10 also contends that the CDA's immunity cannot protect the Defendants because the CDA does not cover distributors. Every published case that has considered the issue has held that the CDA immunizes distributor liability as well as publisher liability. See, e.g., Zeran v. America Online, Inc., 129 F.3d 327, 331-32 (4th Cir. 1997); Ben Ezra, Weinstein & Co. v. America Online, Inc., 206 F.3d 980,

1   986 (10th Cir. 2000).[28]  Therefore, even if the Defendants are considered distributors

2   rather than publishers, the CDA immunities would still apply to Perfect 10's Claim

3   6 for unfair competition under the UCL and Claim 7 for false advertising.

4

5              4.   *Legislative Purpose*

6

7          Perfect 10's final contention is that the legislative purpose of the CDA is to

8   protect minors from harmful material on the Internet and the Defendants aid in the

9   distribution of offensive and obscene content and should therefore not be able to

10  shield themselves from liability based on the CDA. However, the immunity conferred

11  by the CDA does not depend on the content of the information provided.

12  Furthermore, the portion of the CDA that attempted to regulate indecency on the

13  Internet based on content was deemed unconstitutional.  See Reno v. American Civil

14  Liberties Union, 521 U.S. 844, 885 (1997).  Therefore, this argument is without merit.

15         Based on the foregoing, the Court finds that Perfect 10 has not raised a genuine

16  issue of material fact that Perfect 10's claims against the Defendants for 1) unfair

17  competition under the UCL and 2) false advertising pursuant to California Business

18  & Professions Code §§ 17200 and the common law are not barred by the CDA.

19  Therefore, the Court GRANTS the Defendants summary judgment on Claim 6 for

20  unfair competition under the UCL and Claim 7 for false and misleading advertising.[29]

21

22  **V.    CONCLUSION**

23

24

25         [28]Perfect 10 relies heavily on Barrett v. Rosenthal,
    formerly published as 114 Cal. App. 4th 1379, 9 Cal. Rptr. 3d 142
26  (2004), *review granted* April 14, 2004, S122953.  Since the
    California Supreme Court has granted review of this case, Barrett
27  may not be relied on as precedent.  Cal. State Rules of Court
    976(d) & 977(a).
28

       [29] The Court notes that Perfect 10's Claim 6 for unfair
    competition under § 15 U.S.C. § 1125(a) of the Lanham Act is not
    affected by this ruling.

1    Based on the foregoing, the Court hereby ORDERS as follows:

2

3    A.    Defendant IBill's Motion for Summary Judgment

4

5    Defendant IBill's motion for summary judgment is GRANTED, in part, and

6    DENIED, in part.  The Court:

7

8    1)    GRANTS IBill's motion for summary judgment and finds that IBill is

9          entitled to the safe harbor provision under § 512(a) on Claim 1 for

10         copyright infringement and Claims 8 and 9 for RICO violations;

11   2)    DENIES IBill's motion for summary judgment on Claim Four for

12         wrongful use of a registered mark;

13   3)    DENIES IBill's motion for summary judgment on Claim Five for

14         violation of rights of publicity;

15   4)    GRANTS IBill's motion for summary judgment on Claim Six for unfair

16         competition under the UCL; and

17   5)    GRANTS IBill's motion for summary judgment on Claim Seven for

18         false and misleading advertising.

19

20   B.    Defendant Internet Key's Motion for Summary Judgment

21

22   Defendant Internet Key's Motion for summary judgment is GRANTED, in part,

23   and DENIED, in part.  The Court:

24   1)    GRANTS Internet Key's motion for summary judgment and finds that Internet

25         Key is entitled to the safe harbor provision under §§ 512(a) and 512(d) on

26         Claim 1 for copyright infringement and Claims 8 and 9 for RICO violations for

27         infringements after August 21, 2002;

28   2)    DENIES Internet Key's motion for summary judgment and finds that Internet

           Key is not entitled to the safe harbor provisions under §§ 512(a) and 512(d) on

           Claim 1 for copyright infringement and Claims 8 and 9 for RICO violations for

1    infringements before August 21, 2002;

2    2)    DENIES Internet Key's motion for summary judgment on Claim Five for
3          violation of rights of publicity;

4    3)    GRANTS Internet Key's motion for summary judgment on Claim Six for
5          unfair competition under the UCL; and

6    4)    GRANTS Internet Key's  motion for summary judgment on Claim Seven for
7          false and misleading advertising.

8

9    C.    Defendant CWIE's Motion for Summary Judgment

10

11   Defendant CWIE's motion for summary judgment is GRANTED, in part, and
12   DENIED, in part.  The Court:

13

14        1)    GRANTS CWIE's motion for summary judgment and finds that CWIE
15              is entitled to the safe harbor provision under § 512(c) on Claim 1 for
16              copyright infringement and Claims 8 and 9 for RICO violations;

17        2)    DENIES CWIE's motion for summary judgment on Claim Four for
18              wrongful use of a registered mark;

19        3)    DENIES CWIE's motion for summary judgment on Claim Five for
20              violation of rights of publicity;

21        4)    GRANTS CWIE's motion for summary judgment on Claim Six for
22              unfair competition under the UCL; and

23        5)    GRANTS CWIE's motion for summary judgment on Claim Seven for
24              false and misleading advertising.

25

26   D.    √CCBill's Motion for Summary Judgment

27

28   Defendant CCBill's motion for summary judgment is GRANTED, in part, and
     DENIED, in part.  The Court:

1       1)     GRANTS CCBill's motion for summary judgment and finds that CCBill is entitled to the safe harbor provision under § 512(a) against Perfect 10's Claim 1 for copyright infringement and Claims 8 and 9 for RICO violations;

2)     DENIES CCBill's motion for summary judgment of Claim Four for wrongful use of a registered mark;

3)     DENIES CCBill's motion for summary judgment of Claim Five for violation of rights of publicity;

4)     GRANTS CCBill's motion for summary judgment of Claim Six for unfair competition under the UCL; and

5)     GRANTS CCBill's motion for summary judgment of Claim Seven for false and misleading advertising.

**IT IS SO ORDERED.**

**Dated:** _June 22, 2004_

**LOURDES G. BAIRD**
**United States District Judge**

56